CARY A. HARDEE, GOVERNOR, ERNEST AMOS, COMPTROLLER, J. C. LUNING, STATE TREASURER, RIVERS BUFORD, ATTORNEY GENERAL, AND NATHAN MAYO, COMMISSIONER OF AGRICULTURE, OF AND COMPOSING THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, AND PARK L. WILSON, MARY C. WILSON AND ALFRED A. WILSON, *Appellants,* v. RALPH A. HORTON, *Appellee.*

En Banc.

Opinion Filed November 3, 1925.

Petition for rehearing denied April 15, 1926.

JONES, Circuit Judge.

1. A map or plat which represents no survey, but is prepared by projecting lines of a prior erroneous Government survey on paper over a space representing a large area of unsurveyed lands, purporting to represent section, township and range lines according to the rectangular method of surveying, although adopted and referred to in deeds of conveyance as the official map of the grantor, when shown by competent testimony to be inaccurate and unreliable as an aid to locate the unsurveyed lands which are conveyed by description according to the rectangular method of describing lands, is insufficient as a survey of said lands.

2. A complete title to unsurveyed public lands does not vest in the grantee until the lands conveyed have been identified by an authorized survey; and where unsurveyed lands are conveyed by description according to the rectangular method of describing lands, although the deed be a grant *in praesenti* the title rests in the grantee upon delivery of the deed subject to the right and duty of the political authorities of the State to identify and separate by a survey the lands conveyed from the unsurveyed lands within which they are included.

3. In the purchase of swamp and overflowed lands that have not been surveyed the vendees take them with notice that the lands described are to be located by an authorized survey, and that all property in the State is acquired and held subject to the due exercise by the State of its police power.

4. Where purchases of unsurveyed lands in large areas are made in given acreage described by sections, townships and ranges, which contemplate six hundred and forty acres to the section, and thirty-six sections to the township, the exact location and boundaries of the particular lands intended to be conveyed may be ascertained by an authorized survey; and if the lands so located are not all in fact precisely where the purchasers supposed they would be no harm is done the purchasers even though the purchases were made with reference to a plat on which lines were merely protracted on the plat over the space representing the unsurveyed area since an actual survey was contemplated and a particular acreage was intended to pass by description used.

5. Where the boundaries mentioned in a deed of conveyance are inconsistent with each other those are to be retained which best subserve the prevailing design manifested on the face of the deed, and the least certainty must yield to the greater certainty in the description.

6. Where land is clearly and explicitly described in a deed and a subsequent clause is added as a further description of it, but which is of doubtful import, or repugnant to the first clause, such latter description will be rejected.

7. Where an erroneous map which represents no survey is re-
ferred to in a deed conveying unsurveyed lands by a more
particular description, and there is conflict between the map
and the more particular description, the lands should be
located by the more certain and definite description and the
erroneous map may be treated as surplusage.

An Appeal from the Circuit Court for Dade County; H.
Pierre Branning, Judge.

Decree reversed.

*Glenn Terrell* and *J. B. Johnson,* for Appellants.

*Evans* and *Mershon,* for Appellee.

### STATEMENT.

By treaty of February 22, 1819, Spain ceded "to the
United States in full property and sovereignty, all the
territories * * * known by the name of East and
West Florida," with an expressed provision that all the
grants of land made by Spain before January 24, 1818, in
said territories shall be ratified and confirmed to the per-
sons in possession of the lands. State ex rel. Ellis v. Gerb-
ing, 56 Fla. 603, 47 South. Rep. 353, 22 L. R. A. (N. S.) 337.

Under that treaty the United States acquired the owner-
ship of all lands, including the swamp and overflowed lands
in the area now constituting the territorial limits of the
State of Florida that had not been granted or conveyed to
private ownership prior to January 24, 1818, "when the
first proposal for the cession of the Floridas was made" by
Spain. See Art. VIII of Treaty, 1 Rev. Gen. Stats. p. 239.

The admission of the State of Florida into the Union by
the Act of Congress approved March 3, 1845 (5 Stat. 788),
did not affect the proprietary rights of the United States

in the lands within the State that had been ceded to the United States by Spain, where such lands did not constitute the beds or shores of the navigable waters of the State, or tide lands. Trustees Internal Improvement Fund v. Root, 63 Fla. 666, 58 South. Rep. 371; Brickell v. Trammell, 77 Fla. 644, 82 South. Rep. 221.

By virtue of an Act of Congress approved September 28, 1850, the State of Florida was granted in proprietary right all of the then unsold swamp and overflow lands in the State, which grant covered more than 20,000,000 acres of "swamp and overflowed lands, made unfit thereby for cultivation." The Act of Congress required the Secretary of the Interior "to make out an accurate list and plats of the lands * * * and transmit the same to the Governor of the State * * * and at the request of said Governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in the said State * * * subject to the disposal of the legislature thereof." This statutory provision contemplated a survey of the granted lands to be made by the United States authorities, and the issuance of a patent, before the title became fully vested to particular lands (Byrne Realty Co. v. South Florida Farms Co., 81 Fla. 805, 89 South. Rep. 318; Little v. Williams, 231, U. S. 335, 34 Sup. Ct. Rep. 68) and required "that in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is "wet and unfit for cultivation," shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom." Some of the granted lands were surveyed by the Federal authorities, and patents covering lands found to be within the grant were issued to the State from time to time. In the lower part of the peninsular portion of the State of Florida south of Lake Okeechobee, is

an immense area of several million acres that at the time of the grant in 1850 belonging to the United States and was perhaps in its entirety "swamp and overflowed lands, made thereby unfit for cultivation." This area was and is known as "The Everglades." The areas both east and west of the margins of the Everglades were surveyed by the United States authorities. These surveys terminated in the marginal land where the higher ground merged into the marsh of the Everglades, the natural boundaries of the Everglades being the shores of Lake Okeechobee at the northern edge of the Everglades and the shores of the sea at their southern edge, there being a comparatively narrow area of more elevated lands on the east towards the Atlantic Ocean and a wider area of higher lands on the west towards the Gulf of Mexico.

The swamp and overflowed lands granted to the State by the Act of Congress of September 28, 1850, were by Chapter 610, Laws of Florida, approved January 6, 1855, vested in designated State Officers as Trustees of the Internal Improvement Fund of the State of Florida, and lands patented to the State under the Federal grant were and are held and disposed of by such Trustees as directed by the statutes of the State. The lands in the Everglades were perhaps wholly swamp and overflowed in their nature which under the Act of Congress of 1850 would make them inure to the State as an entirety except the sixteenth sections previously granted to the State by Act of Congress approved March 3, 1845, "for the support of public schools." State ex rel. Kittel v. Jennings, 47 Fla. 307, 35 South. Rep. 986. Because of the character of the lands in the Everglades, there would be little if any highlands in the area that would under the Act of 1850 be reserved to the United States as the result of surveys, and the general government made no surveys of the Everglades, therefore the Secretary of Interior could not

"make out an accurate list and plats of the lands" as required by the granting Act of Congress. No surveys of the Everglades having been made by the United States so as to issue patents describing the lands pursuant to the rectangular system of surveying the public lands, on April 29, 1903, Governor W. S. Jennings obtained a patent, No. 137, from the United States government covering "The Everglades," being swamp and overflowed lands within stated "metes and bounds," (with particular exceptions covering "all of what would be the school sections if the lands were surveyed" and other small described areas) the lands covered by the patent "containing in the aggregate an estimated area of 2,862,280 acres." The description by "stated metes and bounds" followed the lines of existing Government surveys around the edges of the Everglades on the east and west sides, and the shores of Lake Okeechobee and of the Gulf on the north and south respectively.

The Patent is as follows:

"No. 137.

THE UNITED STATES OF AMERICA.

"To all to whom these presents shall come, Greeting.

"WHEREAS, By the Act of Congress approved September 28, 1850, entitled 'An Act to enable the State of Arkansas and other States to reclaim the 'Swamp Lands within their limits,' it is provided that all the 'Swamp and Overflowed Lands,' made unfit thereby for cultivation, within the State of Florida, which remained unsold at the passage of said act, shall be granted to said State:

"AND WHEREAS, In Pursuance of instructions from the General Land Office of the United States, the several tracts or parcels of land hereinafter described have been selected as 'Swamp and Overflowed Lands,' inuring to the said State under the act aforesaid, situate in the District of Lands subject to sale at Gainesville, Florida, to-wit:

"The Everglades, being the swamp and overflowed lands within the following *metes and bounds*: Commencing at the Southwest corner of T. 60 S. R. 37 E., where the west line of said township touches the water, then run north along said west line of said T. 60 S. R. 37 E., to the northwest corner of said township; then east along the north line of said township to the southwest corner of T. 59 S. R. 38 E., thence north along the west line of Tps. 59, 58 and 57 S. R. 39 E., to the northwest corner of T. 57 S. R. 38 E., thence east along the north line of said T. 57 to the northeast corner of Sec. 6 T. 57 S. R. 38 E., thence north along the west line of Secs. 32, 29, 20, 17, 8 and 5 of T. 56 S. R. 38 E., to the northwest corner of Sec. 5, thence east along the north line of T. 56 S. R. 38 E., to the southwest corner of T. 55 S. R. 39 E., thence north along the west line of said T. 55 to the northwest corner of said township, thence east along the north line of T. 55 Rgs. 39 and 40, to the northwest corner of Sec. 3 of said T. 55 R. 40, thence north along the west line of Secs. 34 and 27 T. 54 S. R. 40 E. to the northwest corner of Sec. 27, thence east along the north line of Sec. 27 to the northeast corner of said section, thence north along the west line of Secs. 23, 14, 11 and 2 of T. 54 R. 40 to the northwest corner of Sec. 2, thence east along the north line of Secs. 2 and 1 of said T. 54 to the northeast corner of said Sec. 1, thence north along the west line of Tps. 53 and 52 S. R. 41 E., to the northwest corner of T. 52, thence east along the north line of T. 52 R. 41 to the northeast corner of said township, thence north along the west line of Tps. 51, 50, 49, 48 and 47, R. 42 to the northeast corner of said T. 47, thence west along the north line of T. 47 to the northwest corner of Sec. 2 T. 47, thence north along the west line of Secs. 35, 26, 23, 14 and 11 of T. 46 S. R. 41 E. to the northwest corner of Sec. 11, thence east along the north line of Sec. 11 T. 46

to the middle of said section, thence north along the middle line of Sec. 2 T. 46 R. 41 and Sec. 35 T. 45 R. 41 to the middle of the south line of Sec. 26 in T. 45 R. 41, thence west along the south line of Sec. 26 to the southwest corner of said section, thence north along the west line of Secs. 26, 23, 14, 11 and 2 of T. 45 R. 41 to the southwest corner of said township, thence north along the west line of said township 44 to the northwest corner of said township, thence west along the south line of T. 43 R. 40 to the southwest corner of said township, thence north along the west line of said T. 43 to the northwest corner of said township, thence west along the north line of T. 43 R. 39 to the northwest corner of said township, thence north along the west line of T. 42 R. 39 to the northwest corner of said township, thence north along the west line of T. 41 R. 39 to the southwest corner of Sec. 19 T. 41 R. 39, thence west along the south line of Sec. 24 T. 41 R. 38 to the southwest corner of said Sec. 24, thence north along the west line of said section 24 to the northwest corner thereof, thence west along the south line of Sec. 14 said T. 41 R. 38 to the southwest corner thereof, thence north along the west line of said Sec. 14 to the northwest corner thereof, thence west along the south line of Sec. 10, same T. and R. to the southwest corner of said section, thence north along the west line of said Sec. 10 to the northwest corner of said section, thence west along the south line of Sec. 4, same township to the southwest corner of said section, thence north along the west line of said Sec. 4 to the northwest corner thereof, thence west along the north line of T. 41 Rgs. 38 and 37 to the waters of Lake Okeechobee, thence southerly and westerly around the shores of Lake Okeechobee and northerly along said lake to a point in T. 41 S. R. 32 E., where the north line of said township strikes the lake, thence west on the north township line of T. 41 R. 32

to the northeast corner of lot 1 of Sec. 5, in said T. 41 R. 32, thence along the meander line in a southerly direction of Secs. 5, 8, 17, 16, 21, 28, 32 and 31 in T. 41 R. 32, thence southerly along the meander line of Sec. 6 T. 42 R. 32, thence along the meander line southwesterly of Secs. 1, 11, 14, 22, 21, 28, 29 and 30 of T. 42 R. 31, thence south along the west line of said T. 42 R. 31 to the southwest corner thereof, thence east along the north line of T. 43 R. 31 to the northeast corner of fractional Sec. 4, thence south along the east lines of fractional section 4 and Sec. 9 to the southeast corner of said Sec. 9, thence east along the north line of Sec. 15 to the northeast corner of the W½ of NW¼ of Sec. 15, thence south along the east line of the W½ of NW¼ and W½ of SW¼ of said Sec. 15 and the east line of the W½ of NW¼ of Sec. 22 to the southeast corner of the W½ of NW¼ of Sec. 22, same township, thence east along the middle line of Sec. 22 to the northeast corner of the SW¼ of said Sec. 22, thence south to the center of Sec. 34 in the same township, thence east along the middle line of Secs. 34, 35 and 36 to the east township line, thence from the northeast corner of the SE¼ of said Sec. 36 to the southeast corner of said section, thence east along the north line of T. 44 S. R. 32 E., to the northeast corner of said T. 44 S. R. 32 E., thence south along the east line of said township 44 to the southeast corner thereof, thence east along the north line of T. 45 R. 33 to the northeast corner of said T. 45, thence south along the east line of Tps. 45 and 46 R. 33 to the southeast corner of T. 46, thence east of lot 1 Sec. 5 T. 47 S. R. 34 E., thence south to the center of Sec. 5, thence east to the northeast corner of the SE¼ of Sec. 5, thence south along the east line of Secs. 5, 8, 17 and 20, to the northeast corner of the SE¼ of said Sec. 20, thence east to the center of Sec. 21, thence south along the middle line of Secs. 21 and 28 to the southeast

Hardee et al. Trustees v. Horton—Opinion of Court.

corner of the SW¼ of Sec. 28, thence east along the
south line of Sec. 28 to the northeast corner of Sec. 33,
thence south along the east line of Sec. 33 of said T. 47
R. 34 to the southeast corner of said Sec. 33, thence east
along the north line of T. 48 R. 34 to the northeast
corner of said township, thence south along the east line of
Tps. 48 and 49 to the southeast corner of T. 49 R. 34,
thence west along the south line of said T. 49 to the south-
west corner of said T. 49 S. R. 34 E., thence south along
the east line of T. 50 R. 33 to the southeast corner thereof,
thence east along the south line of T. 50 R. 34 to the south-
east corner thereof, thence south along the west line of
Tps. 51 and 52 to the southeast corner of T. 52 R. 34,
thence west along the north line of T. 53 to the northwest
corner of T. 53 R. 33, thence south along the west line
of T. 53 R. 33 to the southwest corner thereof, thence west
along north line of T. 54 Rgs. 32, 31, 30 and 29 to the
waters of the Gulf of Mexico, then following the main land
in a southerly direction to the point of beginning in T.
60 S. R. 37 E.; there are eliminated and excepted from the
above all islands in the Gulf of Mexico adjacent to the
main land; all of what would be the school sections if the
lands were unsurveyed; and the following decriptions, viz:
the SE¼ of SW¼ Sec. 23 and the NW¼ of NE¼ Sec. 25
T. 50 S. R. 40 E.; the NE¼ of SW¼ Sec. 20 T. 50 S. R. 41
E.; the NE¼ of SW¼ Sec. 20 T. 50 S. R. 41 E.; the W½
of NE¼, E½ of NW¼, SW¼ of NW¼, NW¼ of SE¼
and N½ of SW¼ Sec. 1 and the E½ of SE¼, Sec. 2 T. 51
S. R. 41 E., as surveyed by Special Agent J. O. Fries in
1898, and as designated on a special plat approved Novem-
ber 16, 1899, accepted April 25, 1900, containing in the
aggregate an estimated area of two million eight hundred
and sixty-two thousand two hundred and eighty (2,862,-
280.00) acres; and for which the Governor of the said State
of Florida, did on the sixth day of April, nineteen hundred

and three request a patent to be issued to the said State as required in the aforesaid act.

"Now, therefore, know ye that the United States of America, in consideration of the premises, and in conformity with the act of Congress aforesaid, have given and granted and by these presents do give and grant unto the said State of Florida, in fee simple subject to the disposal of the Legislature thereof, the tracts of land above described.

"To have and to hold the same together with all the rights, privileges, immunities and appurtenances thereto belonging unto the said State of Florida, in fee simple and to its assigns forever.

"In testimony whereof, I, Theodore Roosevelt, President of the United States of America, have caused these letters to be made patent and the Seal of the General Land Office to be hereunto affixed.

"Given under my hand at the City of Washington, the twenty-ninth day of April in the year of Our Lord nineteen hundred and three and of the (Seal) Independence of the United States the one hundred and twenty-seventh.

By the President:          T. Roosevelt.

By F. M. McKean, Secretary.

C. H. Brush, Recorder of the General Land Office.

Recorded V. 3, pp. 333-336, inc.''

The land in controversy was included within the unsurveyed Everglades lands conveyed by Patent No. 137.

During the year 1904 the Trustees of the Internal Improvement Fund took steps to get the unsurveyed lands in Florida duly surveyed by the Federal authorities. No survey of the Everglades having been made by the United States, the Trustees of the Internal Improvement Fund, on January 2, 1905, adopted as the "official map of the

Everglades, covering the lands embraced in U. S. Patent No. 137'' a map upon which the State Land Office ''had extended the lines by rule from the surveyed lines on the east and west side of the Everglades, *which is as near a location* of the sections, townships and ranges *as we can furnish without an actual survey* of the'' Everglades. The proceedings as to the map are as follows:

"Tallahassee, Fla., January 2, 1905.

Hon. W. S. Jennings,
  Chairman Trustees Internal Improvement Fund,
    Tallahassee, Fla.

Sir:

"In compliance with your request I here hand you a map which has been prepared in the Land Office, showing the area of the Everglade Patent, known as No. 137.

"We have extended the lines by rule from the surveyed lines on the east and the west side of the Everglades, which is as near a location of the sections, townships and ranges as we can furnish without an actual survey of the same.

"I trust the same will be satisfactory.

Yours very truly,
B. E. McLIN,
Commissioner of Agriculture.

"After consideration, the following resolution was adopted:

"*Resolved*: That the letter of Hon. B. E. McLin, Commissioner of Agriculture, be spread on the minutes of the Trustees and that the map of the Everglades, as prepared under his direction, be and the same is hereby adopted as the official map of the Everglades land, embracing the lands in U. S. Patent No. 137, containing 2,862,280 acres, and that said map be identified by the Secretary endorsing thereon the following words and figures, viz:

" 'Official map of the Everglades, covering the lands

Official Map of Everglades Combining the Lands Embraced in
Everglades Patent No. 137 as Adopted by Trustees in Resolution
Dated June 10th and June 14th, 1907.

embraced in U. S. Patent No. 137, prepared under direction of Hon. B. E. McLin, Commissioner of Agriculture, and adopted as official by the Trustees of the Internal Improvement Fund of the State of Florida, January 2nd, 1905.'

"*Be it further Resolved,* That the map be entered on record on a separate page of the minute book of the Trustees of the Internal Improvement Fund of the State of Florida, and that a copy of said map, duly certified as aforesaid, be filed in the office of Hon. B. E. McLin, Commissioner of Agriculture." Map, p. 6; Minutes Trustees I. I. Fund, Vol. 6, pages 5 and 6; Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, text 96, 87 South. Rep. 68.

On June 10, 1907, the Trustees of the Internal Improvement Fund adopted the following:

"Hon. B. E. McLin, Commissioner of Agriculture, having prepared an amended map of the lands embraced in U. S. Patent No. 137, in accordance with the request of the Trustees, and the same having been presented, examined and approved, it was

"*Resolved,* That the amended official map of the Everglades, covering the lands embraced in U. S. Patent No. 137, prepared under the direction of Hon. B. E. McLin, Commissioner of Agriculture, be, and the same is hereby adopted as official by. the Trustees of the Internal Improvement Fund of the State of Florida, on this, the 10th day of June, A. D. 1907, and,

"*Resolved, further,* That the amended map be entered of record on a separate page of the minute book of the Trustees of the Internal Improvement Fund, and that a copy of said map, duly certified by the Secretary of the Trustees, be filed in the office of the Commissioner of Agriculture." Minutes Trustees I. I. Fund, Vol. 7, pages 66, 67 and 68.

On June 14, 1907, the Trustees of the Internal Improvement Fund of the State of Florida adopted the following:

"Resolved, By the Trustees of the Internal Improvement Fund of the State of Florida, that the township, ranges and sections of the official map of the Everglades adopted by the Trustees under date of January 2nd, 1905, and as amended by resolution of said Trustees of June 10, 1907, embracing the lands in the U. S. Patent No. 137, be and the same are hereby adopted and ratified as the townships, ranges and sections of said map, which townships, ranges and sections as the same appear to be designated upon said official map of the Everglades, were so designated and determined by projecting on said map the township, range and section lines of the original United States Survey as the same appear on said map, and that the sections indicated on said official map of the Everglades, as adopted by the Trustees of the Internal Improvement Fund of the State of Florida, as aforesaid, be numbered similarly and under the same plan and system as sections are numbered under the township, range and section system adopted by the United States, and of the same force and effect, beginning with section one (1) and continuing to section thirty-six (36) inclusive, fractional townships to be numbered under the same system, being designated by such numbers as will make them uniform with the system of the United States."

"This resolution to be written on the official plats or maps and signed by the Trustees, where such official plat is furnished by or under the direction of the Trustees." Minutes I. I. Fund, Vol. 7, pages 70 and 71.

Pursuant to the above resolution of June 14, 1907, the map as above shown approved June 10, 1907, was enlarged and section lines with appropriate numbers were put upon the map.

The maps of 1905 and 1907 were made by merely projecting on paper, across a space representing the unsurveyed public lands covered by the Everglades Patent No.

137, township and range lines that were assumed to correspond with lines that had under Federal authority been surveyed from the east and from the west to the marsh lands of the Everglades. There had been no survey of the Everglades lands and the correctness of the locations of the lines terminating at the edge of the marsh lands of the Everglades had not been verified or questioned. It was assumed that the lines of the surveys from the east and from the west at the edge of the Everglades were at the proper points according to the law and rules governing government surveys of public lands.

·On October 13, 1908, the Trustees of the Internal Improvement Fund of Florida, "for and in consideration of the sum of two dollars per acre," conveyed to Walter Comfort, "the following described lands, to-wit: The South half of the South half of Section Twenty-five; the South half of the South half of Section Twenty-seven; the South East Quarter of the South East Quarter of Section Thirty-three, and all of Sections Thirty-four, Thirty-five and Thirty-six in Township Fifty-three South, Range Forty East, according to map adopted as official by Trustees of Internal Improvement Fund of Florida, January 2, 1905, and as amended June 10, 1907 and June 14, 1907; also all of Sections Three, Ten and all of Section Fifteen except the South East Quarter of South West Quarter, in Township Fifty-four South, Range Forty East; All of Sections Six and Seven, and the West half of Sections Eighteen, Nineteen and Thirty in Township Fifty-three South, Range Forty-one East, containing 6,422.13 acres, and lying and being in the County of Dade, in said State of Florida."

As shown by the records of the State Land Office, the area of the surveyed land together with the contemplated 640 acres in each section of the described unsurveyed lands make a total of 6,422.13 acres as stated in the deed.

On June 3, 1909, Comfort and wife conveyed to the

Seminole Fruit and Land Company together with other lands all of Section Thirty-five, Township Fifty-three South, Range Forty East, "according to map adopted as official by Trustees of Internal Improvement Fund of Florida, January 2, 1905, and as amended June 10, 1907, and June 14, 1907."

Instructions were issued in 1910 for a legal survey of the Everglades lands.

On December 23, 1912, the State Trustees adopted the following:

## "AMENDED INSTRUCTIONS

*"For Surveying the Land Embraced in U. S. Patent No. 137 known as the Everglades.*

"WHEREAS, The Trustees of the Internal Improvement Fund of the State of Florida did, on December 29, 1910, approve and adopt certain resolutions for surveying the land embraced in U. S. Patent No. 137, known as the Everglades; and

"WHEREAS, These instructions were based on the lines and corners established by the U. S. Survey of the adjacent territory, together with a map and resolutions of the Trustees of the Internal Improvement Fund, adopted June 11, 1907; and

"WHEREAS, The field notes, with few exceptions, of the U. S. Survey show the townships abutting the Everglades to be 480 chains long on each side, and the sections to be one mile square; and

"WHEREAS, The official map adopted by the Trustees was predicated on the Government Survey and Field Notes, and was supposed to give townships six miles square, containing 640 acres each; and

"WHEREAS, It has been found by actual measurement that practically all the townships adjacent to the land embraced in the Everglades Patent No. 137 are more than

Hardee et al. Trustees v. Horton—Opinion of Court.

480 chains long, and the sections more than one mile square, and it being the desire and intention of the Trustees to have the sections contain 640 acres each, no more nor less, if possible; therefore,

"BE IT RESOLVED, That the instructions heretofore issued be, and the same are hereby amended so as to subdivide the land embraced in the U. S. Patent No. 137 into townships six miles square, each township containing 36 sections of 640 acres each, as near as may be, and the same be made to conform as nearly as practicable to the U. S. requirements in regard to the survey of public lands, and that the surplus found to exist be placed as shown on the accompanying map, as near as practicable; the object of the map being to show the general plan of the survey and the general distribution of the surplus, if any. Said map to be filed in the office of the Secretary of the Trustees." Minutes Trustees I. I. Fund, Vol. 9, p. 628.

The detail instructions have reference to the letters and figures on the map.

A survey of Township 53 South, Range 40 East, with other townships, having been made by the State, on May 2, 1919, the Trustees of the Internal Improvement Fund conveyed to Edward Wilson all of Lot 2, being one of the six lots that had by the State survey been formed between Section 35, Township 53 South, Range 40 East, and Section 2, Township 54 South, Range 40 East, to properly survey 1635 acres of surplus lands.

On July 21st, 1920, the Seminole Fruit and Land Company conveyed to Ralph A. Horton the "Southwest quarter of the southwest quarter of the southwest quarter of Section 35, Township 53 South, Range 40 East, according to map adopted as official by Trustees of the Internal Improvement Fund of Florida, January 2nd, 1905, and as amended June 10th, 1907, and June 14th, 1907." The

Map to Accompany Amended Instructions for Surveying Everglades Land Adopted by the Trustees I. I. Fund Dec. 23rd, 1912.

proper location of that quarter quarter section embracing ten acres is the matter in controversy here.

The rectangular system of surveys embodying townships and sections of a normal size, with correction strips where required, is the system used by the United States in the survey of its public lands. A survey of this nature was made by the State authorities. See Statement in Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 South. Rep. 68.

The Constitution provides that ''The Commissioner of Agriculture * * * shall have supervision of all matters pertaining to the public lands under regulations prescribed by law.'' Sec. 26, Art. IV.

The statutes provide that ''there shall be a public land office for the State of Florida, to be kept in one of the rooms in the capitol; in which office shall be deposited and preserved all the records, surveys, plats, maps, field notes and patents, and all other evidence touching the title and description of the public domain, and all lands granted by Congress to this State, or which may hereafter be granted for whatever purpose the same may be given.'' Sec. 165, Rev. Gen. Stats. 1920.

''The Commissioner of Agriculture * * * shall have custody of all the records, surveys, plats, maps, field notes, patents, and all other evidence touching the title and description of the public lands.'' Secs. 166, 167, Rev. Gen. Stats. 1920.

The Commissioner of Agriculture is the one of the five statutory Trustees of the Internal Improvement Fund of the State of Florida. Secs. 1054, 1055, Rev. Gen. Stats. 1920.

JONES, Circuit Judge.

Appellee, hereinafter designated as complainant, filed his bill against the Trustees of the Internal Improvement

Fund of Florida, composed of the Governor, Comptroller, State Treasurer, Attorney General and the Commissioner of Agriculture, hereinafter designated as the Trustees, and other defendants named, to remove cloud from title to the SW¼ of SW¼ of SW¼ of Sec. 35, Township 53 South, Range 40 East.

The bill abbreviated alleges that the complainant is the owner of said land and has a fee simple title to same acquired by mesne conveyances from one W. R. Comfort, to whom the Trustees conveyed said Sec. 35 in 1908; that said township was included in that large body of land located in the State of Florida known as "The Everglades," which was patented to the State of Florida by the United States under and by virtue of an Act of Congress approved September 28, 1850, said patent being known as Everglades Patent No. 137. That said lands at the time of the issuing of said patent and the execution of the deed to Comfort had never been surveyed and were wild, unimproved and not in possession of any one. That by Chapter 610, Laws of Florida, Acts 1855, the title to all of said lands so patented vested in five State officers named herein as Trustees with the power and authority to sell and convey same. That the Trustees, in order to provide means for definitely locating and describing, and in order to sell said lands, caused a division of said lands to be made whereby said lands were divided into sections, townships and ranges by rulings on a map without actual survey in the field, by extending over and across the map of said lands township and range lines located and established by actual survey in the field by the United States in adjacent and surrounding territory. That said map was adopted on January 2, 1905, by the Trustees as the official map of the lands so platted, and embraced in Everglades Patent No. 137, and upon June 10 and June 14, 1907, they amended and confirmed the map adopted as aforesaid as official,

and caused the sections as shown on said map to be num-
bered similarly and under the same plan and system as
sections are numbered under the township, range and sec-
tion system adopted by the United States, and caused said
map so numbered to be recorded in the office of the Circuit
Court for Dade County, Florida.

That afterwards the Trustees conveyed to one W. R.
Comfort certain land being a portion of the lands em-
braced in the Everglades Patent No. 137, to-wit: All of
Sec. 35, Township 53 South, Range 40 East, according to
said map adopted as official, and as amended in 1907, and
that through mesne conveyances from Comfort complain-
ant is now the owner of SW¼ of SW¼ of SW¼ of said
Sec. 35, and that all the deeds aforesaid conveyed the lands
according to the said map adopted as official and as
amended by the Trustees. That in December, 1912, after
executing the deed from the Trustees to Comfort, the
Trustees adopted certain amended instructions for survey-
ing the Everglades, and adopted a map to accompany the
amended instructions for surveying the said land in the
field. That upon the adoption of the map of 1905-1907,
the location of Sec. 35, Township 53 South, Range 40 East,
and the SW¼ of SW¼ of SW¼ of said section became
definite, fixed and determined, and that the conveyance to
Comfort of said Section 35 was definitely located and
placed according to the map adopted as official in 1905-
1907.

That upon said map Townships 53 and 54 South, Range
40 East, are immediately adjacent to each other, Town-
ship 54 being immediately south of and cornering with
Township 53. That on the map there is no strip of land
between the said Townships 53 and 54, and no strip of
land between said Sec. 35 and Sec. 2, Township 54 South,
Range 40 East, and when surveyed in the field and located

according to the map of 1905-1907, there is no strip of land between the said Sec. 35 and said Sec. 2.

It is further alleged that by the adoption of the amended instructions for surveying and the said map or plat accompanying same, the Trustees attempted to establish between said Township 53 and Township 54 a certain hiatus or strip of land—that said strip of land was attempted to be established between Sec. 35 and Sec. 2, and was by said Trustees numbered and designated as lot two between said Townships 53 and 54, and that said lot 2 is a part of said Sec. 35 conveyed to Comfort as alleged, and embraced all of SW¼ of SW¼ of SW¼ of said Sec. 35, and that by the creation of said lot 2, and by adopting the amended instructions for surveying and the plat accompanying same, the Trustees have changed the location of complainant's said land, and have attempted to deprive complainant of his said land which was sold by the Trustees to complainant's predecessor in title as alleged.

It is further alleged that on May 2, 1919, the Trustees attempted to convey by deed to one Edward Wilson the part of land herein described as lot 2 between said Townships 53 and 54, and that the defendants herein other than the Trustees are the heirs of said Wilson now deceased, and that by virtue of said deed of conveyance by the Trustees to said Edward Wilson, his said heirs are claiming and asserting title to the identical land which is owned and claimed by complainant as SW¼ of SW¼ of SW¼ of said Sec. 35, and that the deed of the Trustees to Edward Wilson attempting to convey lot 2 is void, and is a cloud upon the title of complainant to his said land, and further charges that the Trustees were without lawful authority to change or attempt to change the location of the land of complainant in place, after the Trustees had sold and conveyed said land to Comfort as stated—that by the adoption of the amended instructions for surveying and the map

accompanying same, the location of complainant's land in place when surveyed and located in the field is changed, and that the adoption of the amended instructions and map accompanying same was and is an attempt upon the part of the Trustees to deprive complainant of the said property without due process of law, and prayed that the Wilson deed be cancelled and removed as a cloud upon the title of complainant's said land.

A demurrer to the bill was overruled and answer filed denying that the map of 1905-1907 was made and adopted as official for the purpose of selling, locating or describing the lands covered thereby, but that said map was adopted and intended only as an office convenience to arrive at some approximate location in the field of such lands as might be sold by the Trustees until a survey and definite location thereof could be made upon the ground. That said map was a pencil production made by the Commissioner of Agriculture at the request of the Trustees, and that in the preparation of same the curvature of the earth, deflection or variation of the needle, the configuration of the land, or water, the area or acreage thereof, nor other facts necessary and essential to make a map that would accurately conform to the lands covered thereby were taken into consideration, which the Trustees knew could not be done until surveys in the field were made for the purpose of definitely locating the land, and determining the acreage thereof.

It is alleged that the Trustees conveyed said Sec. 35 to Comfort as a normal section of 640 acres, the location thereof to be made by a survey in the field, and that a survey thereof was in fact subsequently made in the field, and the said land definitely located, and said survey legalized and confirmed by Chapter 7892, Acts 1919, Laws of Florida. It is denied that by the adoption of the map of 1905-1907

the location of said Sec. 35 became definitely located in the field without a survey thereof, or that by the adoption of the map the said Townships 53 and 54 South, Range 40 East, were immediately adjacent to each other, or that said Township 54 is immediately south of and corners with said Township 53, and avers that no part, or corner, or point in the boundary or body of said Township 53 was definitely located until the survey thereof in 1918, and that Comfort purchased said Sec. 35 with full knowledge that it had never been surveyed.

It is further denied in adopting the amended instructions and plat accompanying same for surveying the Everglades they did establish, or attempt to establish between the said Townships 53 and 54 a certain hiatus or strip of land, or that the same was in fact located between said Section 35 in Township 53 and Section 2 in Township 54, as a result of such adoption, but that the said hiatus was found to exist by an actual survey thereof.

It is further denied that the land claimed by complainant is located in lot 2 between Townships 53 and 54, or that the Trustees by the adoption of amended instructions for surveying the Everglades and map accompanying same changed in place the location of said land of complainant, or that they have in fact sold to other parties lands claimed by the complainant.   It is alleged that Comfort purchased said Sec. 35 with the understanding that it contained 640 acres and would be definitely located by a survey in the field, that said section was so surveyed and located and if made to conform to location as contended for in complainant's bill it would contain 677 acres.

It is admitted that Trustees in 1919 conveyed to Edward Wilson, the alleged predecessor in title to defendants other than Trustees, that certain parcel of land being Lot No. 2 between said Townships 53 and 54, but denies said Lot Number 2 is the identical land, or any part of the land

conveyed to Comfort as Sec. 35, and denies that it is the identical land described as being the property of the complainant, and alleges that title to the land embraced in lot No. 2 never passed from the Trustees until it was conveyed by them to Wilson in 1919.

Upon final hearing upon the pleadings and the testimony the Circuit Judge rendered a decree in favor of complainant specifically decreeing that the Trustees in 1908 conveyed to Walter R. Comfort the ten-acre tract of land involved in this suit, and that the deed of the Trustees in 1919 to Edward Wilson purporting to convey the land described as lot No. 2 between Townships 53 and 54 embraces the land conveyed to Comfort, and that Wilson took no title to said land and that his deed was a cloud upon the title of the complainant to the SW¼ of SW¼ of SW¼ of Section 35, Township 53 South, Range 40 East.

In 1905 there was prepared in the State Land Office a map or plat of the lands embraced in Patent No. 137 comprising approximately 3,000,000 acres of wild, unoccupied, unsurveyed lands known as the Everglades. This map did not represent a survey, but merely "extended the lines by rule from the surveyed lands on the east and west sides of the Everglades which is as near a location of sections, townships and ranges as we can furnish without an actual survey of the same," as shown by the official records of the State Land Office. In 1907 this map was amended on which amended map the ranges, townships and sections were marked and numbered according to the rectangular method of surveying, and was adopted as the official map of the Trustees. The map was made by projecting lines on paper over the space representing the unsurveyed lands. The lines were merely drawn on paper from lines representing the lines of prior Government surveys of lands bordering on the east and west sides of the unsurveyed lands. On the map of merely protracted lines Town-

ship 53 South, Range 40 East, appeared to be immediately north of Township 54 South, Range 40 East; the north line of Township 54 appearing to be identical with south line of Township 53. In 1908 Walter R. Comfort purchased a large acreage of these lands including Section 35 in Township 53 South, Range 40 East; his deed from the Trustees described the lands conveyed as half sections and sections in stated townships and ranges according to the official map of 1905-1907, specifying the exact number of acres purchased. In 1909 Comfort conveyed to the Seminole Fruit & Land Company Sec. 35, Township 53 South, Range 40 East, according to map of 1905-1907. In 1911 the State began a survey according to the rectangular system of this great area of unsurveyed lands, and by 1918 had surveyed about 1,000,000 acres, including Township 53 South, Range 40 East. This survey resulted in disclosing a strip of land, or hiatus, nearly half a mile wide between Townships 53 and 54 South, Range 40 East—instead of north line of Township 54 and the south line of Township 53 being identical as they appeared to be on the map, the south line of Township 53 was located by the survey nearly half a mile north of the north line of Township 54, thereby identi-fying Township 53 as the normal township of six miles square containing thirty-six sections each one mile square, and disclosing a surplus of 1635 acres called a hiatus which was designated and numbered Lots No. 1, 2, 3, 4, 5, 6, between Townships 53 and 54 South, Range 40 East, but No. 2 contained 237 acres being between Section 35 of Township 53 and Section 2 of Township 54 South, Range 40 East. In 1919 after the survey the Trustees conveyed to Edward Wilson the lot designated as lot No. 2 between Townships 53 and 54 South, Range 40 East. In July, 1920, the Seminole Fruit & Land Company conveyed to Horton, the complainant, SW¼ of SW¼ of SW¼ of Sec. 35, Township 53 South, Range 40 East, according to the offi-

cial map of 1905-1907. Horton filed his bill alleging that the survey had changed the location of his said ten-acre tract, that instead of being in the southwest corner of Sec. 35 as located by the survey of said section, it was embraced in lot No. 2 and was situated in the southwest corner of the land included within the lines of the map of 1905-1907 numbered as section 35, and prayed for a decree cancelling the deed to Wilson as a cloud upon his title.

Considering the facts chronologically stated as above the questions presented for determination are: Did the State have the right by actual survey to establish the southern line of Township 53 South, Range 40 East nearly a half mile north of where it appeared to be located on the map of 1905-1907 after the purchase by Comfort of Sec. 35 in said township according to the map; and what effect does the reference to the map of 1905-1907 in the deed to Comfort have in locating said Sec. 35? If the land had been previously, although erroneously, surveyed at the time of the grant to Comfort, and the land had been conveyed by description according to such survey, title would have vested in Comfort upon the delivery of the deed and the State would have been without authority to change any boundary line of the land so conveyed. Complainant, however, alleges that at the time of the execution of the Comfort deed, Township 53 South, Range 40 East, was wild, unoccupied, unsurveyed and not in the possession of any person or persons, but insists that the plat of 1905-1907 referred to in the deed is sufficient as a survey to vest title in Comfort upon delivery of the deed to all the land included within the lines of the map numbered as Sec. 35, and recites in support of this contention the case of State ex rel. Kittel v. Jennings, et al., 47 Fla. 307. One of the questions involved in that case was whether a sufficient survey had been made of the 16th section in order that the title to same vested in the State by virtue of the Act of

Congress of March 3, 1845, granting the 16th section in every township to the State for the support of public schools. The facts in that case were, that the fractional township, in which the fractional section 16 in controversy was situated, had been actually surveyed, and the survey approved by the Surveyor General of the State, and the boundary lines of the sections and lots in said township were extended and the boundaries of fractional section 16 in said township were definitely located, and said fractional section was divided into lots which were numbered and the acreage in each lot ascertained by the Surveyor General, and a record thereof was made. The Court held that the actual survey of the fractional township, and approval thereof, and the acts of the Surveyor General showing the existence of fractional section 16 and its acreage, were sufficient to cause the grant of March 3, 1845, to immediately attach to said fractional section 16. The case cited is not authority in the case at bar. In the present case Township 53 had never been surveyed and of course no division into sections had been made and no acreage ascertained, but the township was included within a vast unsurveyed area. It was shown without conflict that the map of 1905-1907 was inaccurate and unreliable as an aid to locate the land. That to survey the land according to the map it would be impossible to separate the land into townships of approximately six miles square including 36 sections each, one mile square as near as may be according to the rectangular system of surveying land, and according to which method of surveying and describing land the land was sold to Comfort and other purchasers. In 1911 when the State began the survey of the Everglades and attempted to survey the land according to the map of 1905-1907 it was discovered that the map could not be made to fit the ground, because it was not prepared from an actual survey, but was merely a paper illustration in a general way

of the land represented by it.  It was discovered that the prior Government surveys on the east and west sides of the Everglades from which the lines were projected on the map were not established in conformity to law; that the lines and corners represented townships and sections usually much larger than sections and townships of normal size; that these discrepancies were in many instances so great that surplus areas, or deficiencies in area, could not be thrown into townships and sections and taken care of in the usual manner.  Upon a survey it was disclosed that Sec. 35 alone, in Township 53, included according to the map of 1905-1907, 877 acres, or approximately 237 acres more than Comfort purchased.  Because of these discrepancies and the great importance of definitely identifying lands sold and to be sold by description according to the rectangular method of describing lands an actual and authorized survey according to such method was necessary. The map of 1905-1907 represented no survey.  It does not identify the lands as they actually exist in the field, and as they are described in the deeds of conveyance and it was never intended as a substitute for a survey, but it being impossible even to approximately locate the more than 4,000 sections of unsurveyed lands by inspecting a map with a blank space representing this immense area without a line or figure upon it, in order to ascertain as nearly as possible without a survey the location of these sections, townships and ranges the map was procured from the office of the Commissioner of Agriculture, who in his letter transmitting the map to the Trustees says: ''We have extended the lines by rule from the surveyed lines on the east and west sides of the Everglades which is as *near a location of Sections, townships and ranges as we can furnish without an actual survey of the same.*''  The mere fact that the map, known by the parties to represent no survey, was adopted by the Trustees and designated

and referred to in deeds executed by them as their official map can not bestow upon it evidentiary value which it does not possess. And a map or plat which represents no actual survey, but is prepared by projecting lines of a prior, erroneous Government survey on paper, over a space representing a large area of unsurveyed lands, purporting to represent section, township and range lines according to the rectangular method of surveying, although adopted and referred to in deeds of conveyance as the official map of the grantor, when shown by competent testimony to be inaccurate and unreliable as an aid to locate the unsurveyed lands conveyed by description according to the rectangular system of describing lands, is insufficient as a survey of said lands, and in proper cases as hereinafter stated neither grantor nor grantee is bound by such a map to his wrong and injury.

When Comfort purchased Sec. 35, Township 53 South, Range 40 East it was unsurveyed, and, therefore, no title vested in him upon delivery of the deed which would preclude a survey by the State in the exercise of its police powers, and in the performance of an obvious duty.

When title vests in a grantee to unsurveyed lands is stated by 32 Cyc. 868, as follows:

"Grants of certain designated sections are usually considered as grants in praesenti, but when the lands are unsurveyed at the time the grants are subject to location by the Federal Government, and title to the particular section vests absolutely in the State upon the land being surveyed and set off into sections and townships without the necessity of the issuance of a patent."

In the case of Leavenworth, Lawrence and Galveston R. R. Co. v. United States, 92 U. S. 733, the Supreme Court of the United States in construing a land grant to Kansas to aid in the construction of railroads said:

"It creates an immediate interest and does not indicate

a purpose to give in the future. 'There be and is hereby granted' are words of absolute donation and import a grant in praesenti. * * * They vest a present title in the State of Kansas though a survey of the lands and a location of the road are necessary to give precision to it and attach it to any particular tract.''

The Supreme Court of Alabama in construing the School Land Grant of Congress to the State of Alabama in case of Sprayberry v. State, 62 Ala. 459, say:

''The proposed grant of the 16th sections of every township was subject to the exception of such sections as had been sold, granted or disposed of, and then the proposition was that other lands equivalent thereto and most contiguous to those sections should be granted. The proposition, therefore, assumes a two-fold form. If the section 16 had not been sold, granted or disposed of, whenever it was surveyed and identified, the law intervened perfecting the title of the State to that section. * * * The grant of the General Government, which the State accepts, severs it, and the survey under the authority of the former identifies and distinguishes it.''

The case of Cooper v. Roberts, 18 How. 173-782, 15 L. Ed. 338, was an action of ejectment in which plaintiff claimed title to a portion of a certain section number 16 in the State of Michigan, basing his title upon a patent from the State bearing date November, 1851. The defendant claimed title by virtue of a license given by the United States in 1844 to examine and dig for minerals on the land and finally a patent issued by the United States in 1852. The land was surveyed in 1847. After disposing of other questions the Court said:

''We agree that until the survey of the township and the designation of the specific section the right of the State rests in compact, binding it is true the public faith and dependent for execution upon the political authorities.

Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty the compact has an object upon which it can attach, and if there is no legal impediment the title of the State becomes a legal title. The *jus ad rem* by the performance of the executive act becomes a *jus in re,* judicial in its nature and under the cognizance and protection of the judicial authorities as well as others. See 240 U. S. 192; 231 U. S. 335; 164 U. S. 559.

The case of State ex rel. Kittle v. Trustees of Internal Improvement Fund, 47 Fla. 307, 35 So. 986, was a mandamus proceeding to compel respondents to convey to relator fractional section 16 of Township 8 South, Range 8 West, in Calhoun County. It was necessary for the court to construe the Act of Congress of March 3, 1845, granting the 16th sections in every township to the State, and also to determine when title to unsurveyed lands granted by the Act of Congress vested in the grantee. The part of the Act of March 3, 1845, construed by the Court is as follows: "Be it Enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that in consideration of the concessions made by the State of Florida in respect of the public lands, there be granted to the said State * * * Section No. 16 in every township for the support of public schools." At the time of the passage of this Act fractional township 8 South, Range 8 West was unsurveyed, and was not surveyed until 1852, which survey was approved in 1853. In construing the Act and the grant thereby affected the Court said:

"The Act of Congress of March 3, 1845, entitled 'An Act supplementary to an Act for the admission of Florida and Iowa into the Union and for other purposes,' granting school lands to Florida, was in the nature of a compact between the State and the United States Government and

was a special grant in praesenti of every 16th section in every township which previous to survey had not been disposed of under legal authority from the Government of the United States, and when by survey a 16th section or fractional part thereof is ascertained to exist in any township, the grant immediately attaches thereto without a patent by relation back to the date of the Act of Congress.''

. The courts are in accord upon the one point being considered, and that is, that a complete and perfect title to unsurveyed public land does not vest in the grantee until the lands have been identified by a survey authorized by law. We are of the opinion that where unsurveyed public lands are conveyed by description according to the rectangular method of describing land, although the deed be a grant *in praesenti,* the title vests in the grantee upon delivery of the deed subject to the right and duty of the political authorities of the State to identify and separate by survey the lands conveyed from the unsurveyed lands within which they are included.

In the case of Everglades Sugar & Land Company, et al., v. Bryan, et al., 81 Fla. 75, a bill was filed to set aside a sale of land for non-payment of taxes, one of the grounds alleged for relief being that plats were made of the unsurveyed swamp and overflowed lands by projecting lines from points in surveys on each side and making appropriate numbering by which the conveyances were made. That subsequently upon actual surveys a change was made in some of the lines that had been merely protracted, and that this change was attempted to be validated by Chapter 7892, Acts 1919; that the assessments were made according to the descriptions of surveys actually made, and not according to the descriptions under the protracted lines according to which the conveyances of the lands were made, and as a consequence the assessments and sales were illegal and void.

The Court in passing upon the question there presented said:

"In the purchase of swamp and overflowed lands that have not been surveyed, the vendees take them with knowledge and notice that the lands described are to be located by an authorized survey and that all property in the State is acquired and held subject to the due exercise by the State of its police power, and further, where purchases of unsurveyed lands in large areas are made in given acreages described by sections, townships and ranges which contemplate 640 acres to the section and 36 sections to the township, the location of the particular land intended to be conveyed may be ascertained·by authorized survey; and if the lands so located are not all in fact precisely where the purchasers supposed they would be, no harm is done the purchasers, even though the purchases were made with reference to a plat on which lines were merely protracted on the plat over the space representing the unsurveyed area, since an actual survey was contemplated, and a particular acreage was intended to pass by the description used."

Because the deed executed by the Trustees to Comfort described the land as "Section 35, Township 53 South, Range 40 East, acording to map 1905-1907 adopted as official by the Trustees," complainant insists that by such description the map or plat referred to became a part of the deed, and the measure of the land conveyed to him, and its location must be determined in accordance with the plat. It is true when reference is made to a map or plat in describing land conveyed, the effect is the same as if the plat or map were incorporated in the deed, but this rule does not mean that reference to a map which represents no actual survey, and is shown to be inaccurate, shall prevail over another and more particular description so as to enlarge or diminish the quantity of land embraced in the

more definite description; neither does it mean that reference to such a map shall defeat the otherwise clearly expressed intention of the parties, or that the well known rule for interpreting contracts shall be ignored.    The deed to Comfort conveys a large acreage described as half section and sections in stated townships and ranges, and to make the description more explicit and definite, the total number of acres is specifically stated, showing beyond question that the parties understood the half sections and sections described, to be subdivisions of approximately 320 and 640 acres, respectively.    If Township 53 South, Range 40 East had been surveyed acording to the inaccurate map of 1905-1907 it could not have been divided into sections of approximately 640 acres each, because according to the map the east and west township lines were nearly six and a half miles long, and the township would have included approximately 1,400 acres in excess of a normal township.    The excess acreage was so great that it could not be disposed of within the township in the usual manner, therefore it was necessary that an accurate survey of the township be made.    The result of the survey being the identification of Township 53 South, Range 40 East as a township six miles square including thirty-six sections each one mile square and locating the hiatus between Townships 53 and 54.

The allegation that the location of SW¼ of SW¼ of SW¼ of Sec. 35, Township 53 South, Range 40 East was changed in place by the survey cannot be sustained in law or fact.    No one knew where Sec. 35 was situated until Township 53 was located by a survey and Sec. 35 identified. It is obvious if the location of ten acres of a section be changed the location of every part of the section would be changed.    A map of the character of the 1905-1907 map does not and can not accurately locate land, and to hold that such a map is the measure of the land as well as the

best evidence of its location merely because it is referred to in a deed of conveyance which particularly describes the land and stating the acreage conveyed, would be the means of sanctioning the grossest errors and opening the door to intentional fraud. The only method provided by law for an accurate identification of unsurveyed land when described according to the rectangular method of describing land is by a survey according to the rules established by law. The location of no part of Township 53, and the location of no part of Sec. 35 was changed by the survey. The lines established by the survey correspond with the lines of the map except the south line of the township and section which was established by an actual measurement on the ground nearly half a mile north of where it erroneously appeared to be on the map. A fact established by an accurate survey is that the SW¼ of the SW¼ of the SW¼ of Sec. 35, Township 53 South, Range 40 East, is not and never was included within the strip of land designated as lot No. 2 between Townships 53 and 54.

If the more particular description which states the acreage as a section of approximately 640 acres be disregarded and the grantor be bound by reference to a map as the only measure of the land, which map represents no survey and includes 877 acres, or 237 acres more than was purchased and paid for, then a grantee by the same rule should be bound by reference to such a map which included only 303 acres or 237 acres less than a section of 640 acres specifically described in a conveyance to him. The deed should not have such an unreasonable construction if it furnishes evidence for a more reasonable and fair construction. Deeds like other instruments will be given a reasonable construction when that is possible. The court will endeavor to ascertain the real intention of the parties from the whole instrument so that every term may have effect if possible. Where there are two descriptions which con-

flict, the court will construe the deed according to that description which is the more reasonable and equitable to the parties, and will disregard that description which will give to one of the parties an unreasonable and unfair advantage over the other. The court will not infer that the parties agreed that one of them should have an unreasonable and unjust advantage unless such agreement be clearly expressed and supported by some rule of law. If the map referred to in the deed to Comfort were a map of a survey a different question would be presented. It is agreed, however, by the parties that the map represents no survey, that it was prepared by projecting the lines on paper, over a space representing a great unsurveyed area including Township 53, from prior Government surveys, also that the surveys from which the lines were projected are erroneous and do not conform to law; it is therefore established that the map of 1905-1907 is inaccurate, that it is not a picture, as a map of a survey is supposed to be, of the sections, townships and ranges as they actually exist in the field, and is at variance with the lines of Sec. 35, Township 53 South, Range 40 East, as located by an actual authorized survey.

Where the boundaries mentioned in a deed of conveyance are inconsistent with each other, those are to be retained which best subserve the prevailing design manifested on the face of the deed, and the least certainty must yield to the greater certainty in the description. And where land is clearly and explicitly described in a deed, and a subsequent clause is added as further description of it, but which is of doubtful import or repugnant to the first clause, such latter description will be rejected. White v. Gay 31 A. D. 224.

In the case of Cleveland v. Choate, 77 Calif. 73, the Court say:

"When a deed of a city lot refers to an official map of the city, and also stakes at the corners of the lot, parol tes-

timony is admissible to show that the official map is inaccurate, and was compiled from other maps without actual survey; that the stakes referred to were set by another surveyor who located the lot when it was granted by the city trustees as the basis of their grant, and that the tract which the city intended to sell and the grantee intended to buy was then staked off and definitely located by such surveyor. A map referred to in a deed is to be taken as a part of it only when it can be used in aid of the description. Where there is conflict between the map and the survey, the survey controls and the reference to the map may be treated as surplusage.''

The Supreme Court of Georgia in the case of Wooten v. Solomon, 139 Ga. 433, say:

''The plat.is not given by way of more particular description, but as a pictorial representation of what has been described. It is not intended to conflict with the written description, and should not be so considered. But if the plat conflicts with the previous particular description the lot must be located according to the particular description. When a deed describes the lot by metes and bounds and refers to a plat as representing them, the reference is not to enlarge or diminish the effect of the descriptive words of the conveyance, but to give them efficacy, and the operative words are found in the deed itself. See to the same effect Kenyon v. Nichols, 1 R. I. 411; Whiting v. Gardner, 80 Calif. 78; O'Farrell v. Harley, 51 Calif. 125; Hale v. Swift, 63 S. W. 288; Thompson v. Hill, 73 S. E. 640.

.Our opinion summarized is that when Comfort purchased Sec. 35 in Township 53 South, Range 40 East, it was unsurveyed; that courts of justice have no authority to mark out and define unsurveyed land purchased; that Comfort purchased the unsurveyed public land subject to the right and duty of the executive authorities of the State to identify it by a survey; that when that executive act was performed

Comfort and his successors in title, whether before or subsequent to the survey, are bound by it; that where an erroneous map, *which represents no survey,* is referred to in a deed conveying *unsurveyed* land by a more particular description, and there is conflict between the map and more particular description, the land should be located according to the more certain and definite description and the erroneous map may be treated as surplusage.

For the reasons stated the decree appealed from is reversed with instructions to dismiss the bill.

WHITFIELD, STRUM AND BROWN, J. J., AND LONG, Circuit Judge, concur.

WEST, C. J., AND ELLIS AND TERRELL, J. J., disqualified.

WHITFIELD, J., concurring:

For "two dollars per acre" the State Trustees conveyed a definite number of acres of *unsurveyed* public lands including section 35, township 53 south, range 40 east, "according to map adopted as official." The allegations that the section "was definitely located in place according to said map" and that a survey of the land by the State authorities is an attempt to deprive appellee of property without due process of law, are not sustained. The map could not and did not purport to definitely locate in place any of the sections marked on the map representing a vast area of unsurveyed public lands. The map was intended to represent the approximate location on paper of designated sections, townships and ranges that were legally to be surveyed according to the Federal system of surveying public lands. The contemplated legal survey was made and section 35, township 53 south, range 40 east was definitely located, its boundaries being established on the ground. A

subsequent private survey made for the appellee does not and cannot change the location and boundaries of the section as established by the legal State survey.

The conveyance from the United States to the State, Patent No. 137, shown in the statement, embraced all the unsurveyed lands of an *estimated* acreage within an area designated by express reference to specific natural or artificial objects on the ground, *viz.,* Lake Okeechobee and particularly stated fixed survey lines on the north, designated particular survey lines that had been established on the east and on the west and the Gulf of Mexico on the south.

The deed of conveyance from the State Trustees to Comfort embraced a stated *actual* acreage of unsurveyed lands within designated sections, townships and ranges ''according to map adopted as official,'' the map being not the result of a survey, but merely protracted lines of sections, townships and ranges ''as near as we can furnish without an actual survey of the same.'' Patent No. 137 refers to specifically designated survey lines. The deed to Comfort and the map referred to in the deed do not mention any survey lines or other monuments.

It thus seems clear that while the patent to the State covered *all* lands within specifically designated physical boundaries, the conveyance from the State Trustees to Comfort, as to the unsurveyed lands, embraced only lands within designated sections, townships and ranges that were to be legally surveyed and their exact boundaries determined so as to contain the number of acres particularly specified. The deed conveyed to Comfort the title to the described unsurveyed lands. A legal survey locates and fixes the actual boundaries of the unsurveyed lands conveyed. The matters to be determined are the proper location and boundaries of the unsurveyed land conveyed to Comfort in township 53 south, range 40 east, and particularly the location and boundaries of section 35, township

53 south, range 40 east "according to map adopted as official," &c.

The public records showing the origin, nature and purpose of the map are binding on all parties dealing with the title to the public lands referred to by the records and the map.

Section 35, township 53 south, range 40 east, as included in the deed to Comfort was a portion of the large unsurveyed area embraced in the Everglades Patent No. 137. The deed to Comfort does not refer to any survey lines or to objects on the ground, and the "map" referred to in the conveyance to Comfort was not a survey of the unsurveyed lands of the Everglades. The public records of the making, approval and adoption of the map show that the map of January 2, 1905, was merely a representation on paper of "the area of the Everglades Patent, known as No. 137," on which the officials of the State Land Office had "extended the lines by rule from the surveyed lines on the east and the west side of the Everglades, which is as near a location of the sections, townships and ranges as we can furnish without an actual survey of the same." This map was amended June 10, 1907, the section lines being eliminated, leaving the township and range lines protracted over the space representing the large unsurveyed area embraced in the Everglades Patent No. 137. The resolution of June 14, 1907, provided for section lines and numbers to be made on the amended map of June 10, 1907. The original and the amended map were filed in the office of the Commissioner of Agriculture as required by the statutes. The State Land Office is under the official supervision of the Commissioner of Agriculture. Secs. 165, 166, 167, 1054, 1055, Rev. Gen. Stats., 1920. The allegations that the maps were filed in Dade County are not material, since the statute expressly requires all the muni-

ments of title to public lands to be kept in the State Land Office.

Township 53 south, range 40 east and the sections thereof as delineated on the map are of uniform size with other sections and townships marked on the map, indicating that when surveyed township 53 should be of normal size containing thirty-six sections of 640 acres each, which would be consistent with the deed. The contemplated survey was a system having relation to the unsurveyed area of the Everglades and to normal townships; and the survey having been made from an approved previously surveyed and established corner several townships north of township 53, if the south line of township 53 be extended to the north line of township 54, it would make township 53 an abnormally large township that would not accord in size with township 53 as shown on the map and the sections thereof conveyed to Comfort would not comport with the consideration, description and stated acreage of the deed. The lines on the map being protracted on paper "without actual survey" are shown by the contemplated survey to be inaccurate either as to the uniform size of the townships or as to the unity of township lines of consecutively numbered townships; therefore the description and not the map should control.

The "map adopted as official" according to which the State Trustees made conveyances of unsurveyed lands in the Everglades area, was manifestly intended to indicate the approximate location of the section, township and range lines protracted on the map, so that purchasers of the unsurveyed lands in any part of the vast unsurveyed area would know the *approximate* location of the sections and townships that were to be surveyed and numbered according to the Federal system. A survey was needed to give precision to the boundaries described in conveyances. 46 Sup. Ct. Rep. 57. This import of the map appearing in

the public records approving the map as "official" is binding on all parties. Conveyances of unsurveyed lands in the Everglades are of a designated acreage in stated numbered sections, townships and ranges that are to be surveyed and the exact location and boundaries thereof ascertained and established according to the United States system of surveys, so that the townships will contain thirty-six sections of six hundred and forty acres each, the "map" of merely protracted lines being referred to as indicating the *approximate* location of the sections, townships and ranges stated in the conveyances. The contemplated survey has reference to a comprehensive survey of the Everglades area. Separate surveys to locate and establish the exact boundaries of unsurveyed lands described by legal subdivisions in deeds of conveyance, would lead to intolerable confusion and uncertainty in land titles and boundaries; and the governmental power of the State may be exerted to prevent such a general chaotic condition. Such surveys are not contemplated by parties to conveyances of unsurveyed public lands. In this case the parties are bound by the public records relating to conveyances of unsurveyed public lands, and such records contemplate a legal survey of the Everglades area according to a comprehensive system that is regulated by law and in general use in surveying public lands. The State has made the contemplated survey and the lines established by the State are binding on all parties, no fraud being involved. The statute approving the survey as established by the State does not change boundaries or impair vested rights for the reason that in conveyances of unsurveyed public lands, rights in particular boundaries do not exist until the boundaries are established by public authority. Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 South. Rep. 68.

The question here is not of an impairment of vested

rights or of *a change in an actual survey* that had been made of described lands *after a conveyance of them,* but the question is as to the intent and effect of a deed conveying unsurveyed lands. The conveyance was, for a given price per acre, of a stated number of acres of unsurveyed public land, the same being a relatively small part of a large area of unsurveyed public lands all of similar general nature, the description in the deed of conveyance being numbered sections, townships and ranges "according to the map adopted as official," which map was as near a representation of township and range lines as could be furnished "without an actual survey of the same."

The conveyance here considered is not of *surveyed* lands described by metes and bounds, or by sections, townships and ranges, according to a map referred to which purports to represent survey lines that had been actually located and established on the ground. Neither does the description refer to established objects on the ground. In such cases the survey lines established on the ground or the objects on the land that are referred to may control. See East Coast Lumber Co. v. Ellis-Young Co., 55 Fla. 256, 45 South. Rep. 826; Stonewall Phosphate Co. v. Peyton, 39 Fla. 726, 23 South. Rep. 449; Alden v. Pinney, 12 Fla. 348; Andreu v. Watkins, 26 Fla. 390, 7 South. Rep. 876; Davis v. Rainsford, 17 Mass. 207; Cragin v. Powell, 128 U. S. 691, 9 Sup. Ct. Rep. 203; Higuera v. United States, 5 Wall (U. S.) 827; Kirch v. Persinger, 87 Fla. 364, 100 South. Rep. 166.

Nor was the conveyance made according to a map whose lines with practical accuracy correspond with the surface area of unsurveyed lands represented by the map, a portion of which unsurveyed lands is intended to be conveyed. In such cases slight excesses of surface area over that indicated by the map might be contemplated by the parties

and might not affect a legal survey in locating the lands described.

In construing a deed conveying lands and the maps referred to in describing the lands, the nature, origin and purpose of the map, the position of the contracting parties and the circumstances under which they acted, should be considered, and the language used should be interpreted in the light of all the pertinent circumstances 'so as to give effect to the intent of the parties, even if an erroneous part of the description has to be disregarded in effectuating the general intent of the conveyance. 18 C. J. 285; 9 C. J. 228, 229; Campbell v. Carruth, 32 Fla. 264, 13 South. Rep. 432.

The interpretation of a deed conveying land should be "consistent with the manifest intention of the parties." Hogans v. Carruth, 19 Fla. 84; 8 R. C. L. 1085.

In 1908, Walter R. Comfort, for two dollars an acre, purchased a stated number of acres of the unsurveyed lands of the Everglades from the State Trustees. The intent of the parties to the deed from the State Trustees to Comfort covering stated sections, townships and ranges "according to map adopted as official," and containing a specific number of acres, was the conveyance of the stated number of acres in·the specified sections as indicated by the map, which sections were to be thereafter surveyed and their exact location and boundaries determined and established by an official survey having relation to the unsurveyed area, that would give the sections an area of 640 acres· each with appropriate numbering according to the United States system, the township and range numbers being indicated by figures on the margins of the map.

The complainant alleges that the lands "had not been surveyed" and that the "'map was made" "without actual survey in the field." There is uncontradicted evidence "that the lands when conveyed, were not surveyed, but

it was understood that a subsequent survey was to be made in describing the lands."

As the lines appear on the map referred to in the conveyance, the north line of township 54 south, range 40 east, and south line of township 53 south, range 40 east, coincide; but this is not controlling because the map being only a protracted drawing of uncertain accuracy, representing a large area of unsurveyed public lands, and showing township of uniform size, a legal survey of the Everglades area according to the United States system of surveys was necessary and contemplated to locate on the ground the boundaries of lands conveyed, and the system of United States surveys expressly provides that material errors in adjoining surveys should not be extended in making surveys in adjacent unsurveyed territory. Sec. 246 of Manual of Instructions referred to in Section 2399, Rev. Gen. Stats. of U. S. And the Federal statute and authorized rules of survey thereunder, provide for special instructions by administrative officers to control surveys where errors and irregularities appear. See also Ruffner v. Hill, 31 W. Va. 428, 7 S. E. Rep. 13.

The conveyance to Comfort was not of lands beginning at the north line of township 54 as theretofore surveyed, but it was of unsurveyed lands described as being in stated sections and subdivisions of sections in township 53 south, range 40 east. Township 53 had not been surveyed as a legal subdivision and township 54 south, range 40 east, had been only partially surveyed. The fact that the east two miles of the north line of township 54 south, range 40 east, and the west line of township 53 south, range 41 east, had been run, does not give to township 53 south, range 40 east, its definite location and exact boundaries, particularly where the Federal system of surveys expressly provides that errors discovered in one survey are not to be extended into an adjoining survey and special instructions are authorized.

to control the making of a survey where errors appear in an adjacent survey. See Ainsa v. United States, 161 U. S. 208, 16 Sup. Ct. Rep. 544.

. The United States survey lines on the east and west sides of the Everglades were run from the north, and in the survey of township 53 south, range 40 east, the State Surveyor ran the line south from the northwest corner of township 51 south, range 41 east, a verified established corner several townships to the north of township 53; and by running south 18 miles found that the south line of township 53 south, range 40 east, as correctly surveyed, did not reach the north line of township 54 south, range 40 east, as previously surveyed by the United States authorities, and that there were 1635 acres of surplus land between the correct south line of township 53 south, range 40 east and the north line of township 54 south, range 40 east, as previously run by the Federal government. The result was the formation of six lots between the south line of township 53 south, range 40 east, and the north line of township 54 south, range 40 east, each lot being numbered according to the Federal system. The lot between section 35, township 53, and the north line of township 54, is No. 2, and contains 237.4 acres.

Horton's subsequent private survey in 1920 was not authorized by law. It began at the northeast corner of township 54 south, range 40 east, and running west and north surveyed the southwest quarter of southwest quarter of southwest quarter, section 35, township 53 south, range 40 east as being on the north line of township 54 south, range 40 east in the southwest portion of Lot 2 that had been established by the previous State survey. Horton's surveyor testified that no survey had been made by the United States of Township 53 South, Range 40 East, and that he did not locate the southeast corner of Township 53 South, Range 40 East. The survey made for Horton shows that it is of an abnormal and not of a normal Section 35, Township 53

Hardee et al. Trustees v. Horton—Concurring Opinion.

South, Range 40 East, containing 640 acres, as is contemplated by the map referred to in Horton's deed. When Horton's private survey was made, Township 53, including section 35 thereof, had been surveyed by the State, and apparently the survey had for some years been acquiesced in as a proper loctaion of the boundaries of section 35, township 53 south, range 40 east. The records of the State Land Office show that township 53 south, range 40 east, was fully surveyed in 1912, though the hiatus lots south of township 53 were not surveyed till 1918.

As the title to the unsurveyed lands embraced in Patent No. 137 had vested in the State without the lands being surveyed, any legal survey of the lands had to be made under State authority; and as the map referred to in Comfort's deed was by the record of its adoption as "official," shown to be only as near a correct map of the land lines as could be furnished "without an actual survey of the same," and as a proper legal sectional survey of the unsurveyed lands was contemplated so that the specific number of acres purchased in the designated sections could be legally located and their boundaries definitely fixed, it necessarily follows that the parties to the Comfort deed intended that the contemplated legal survey should be made and that the survey should be according to the Federal system, which requires a township to be six miles square, containing thirty-six sections of 640 acres each. In making surveys under the Federal system relatively small excesses of land as they appear are usually added to some section or sections in a township; but where relatively large areas of excess lands appear, some other appropriate and permissible disposition of the excess land should be made; and this is contemplated and provided for by the Federal rules.

The evidence refers to a "Plat of 'Hiatus,' otherwise known as township 44½ south, range 42 east (between townships forty-four and forty-five south, range forty-two

east) Tallahassee Meridian, Florida. Surveyed by William H. Richards, Jr., U. S. surveyor, from April 21 to May 1, 1915, incl., under special instructions from the Commissioner of the General Land Office, bearing date February 5, 1915, approved by the United States Commissioner of the General Land Office September 26, 1916, which plat shows lots formed by survey lines between the stated townships covering different areas from 29.73 to 48.50 acres, totaling 731.19 acres, the same being quite similar to the "hiatus" lots of surplus lands formed by the State survey in 1918 between the south line of township fifty-three and the north line of township fifty-four south, range forty east. See defendant's Exhibit "A," Vol. 13, page 278, Minutes Trustees I. I. Fund.

Section 2399, U. S. Revised Statutes as amended April 26, 1902, authorizes the Commissioner of the General Land Office to give "instructions" for surveying public lands, to meet peculiar conditions encountered in making surveys, therefore it appears that the survey made by the State in forming the hiatus lots south of township fifty-three was in accordance with the system and practice in making U. S. surveys and that such survey was contemplated by the conveyance to Comfort in 1908.

Section 2399, U. S. Revised Statutes as amended in 1902, is as follows: "The printed manual of surveying instructions for the survey of the public lands of the United States and private land claims, prepared at the General Land Office, and bearing date Jan. 1, 1902, the instructions of the Commissioner of the General Land Office, and the special instructions of the surveyor-general, when not in conflict with said printed manual or the instruction of said Commissioner, shall be taken and deemed to be a part of every contract for surveying the public lands of the United States and private land claims." See also Section 453, U. S. Rev. Stats.

Hardee et al. Trustees v. Horton—Concurring Opinion.

The printed Manual of Surveying Instructions, dated January, 1902, referred to in Section 2399, contains the following and *also provides for special instructions to meet particular cases*:

"246. When new surveys are to be initiated or closed upon the lines of old surveys, which although reported to have been executed correctly, are found to be actually defective in alinement, measurement, or position, it is manifest that the employment of the regular methods prescribed for surveying normal township exteriors and subdivisions would result in extending the imperfections of the old surveys into the new, thereby producing irregular townships bounded by exterior lines not in conformity with true meridians or parallels of latitude, and containing trapezium-shaped sections which may or may not contain 640 acres each, as required by law.

"247. Therefore, in order to extend such new surveys without incorporating therein the defects of prior erroneous work, special methods, in harmony as far as practicable, with the following requirements, should be employed, viz:

"The establishment of township boundaries conformable to true meridian and latitude lines.

"The establishment of section boundaries by running two sets of parallel lines governed respectively by true meridians and parallels of latitude, and intersecting each other approximately at right angles at such intervals as to produce tracts of square form containing 640 acres each.

"The reduction to a minimum of the number of fractional sections in a township, and consequently of the amount of field and office work."

In sections 283 *et seq.* of the Manual, provisions are made for surveying "Hiatuses and Overlaps."

The contemplated legal survey had reference to a com-

prehensive system applicable to the unsurveyed area and not to individual surveys of particular portions conveyed. It is shown that the State survey was made according to a comprehensive authorized system; and there is nothing to indicate that any portion of the State survey had reference to the inclusion or exclusion of any particular land in making a subdivisional survey.

The conveyance to Comfort and the map referred to contemplated a system of legal surveys embracing many townships, including township 53 south, range 40 east, and not a particular survey of a subdivision of a section, therefore the contention that after the State survey had been made, the quarter, quarter, quarter section in township 53 that was conveyed to Horton could and should be separately surveyed and its location and boundaries established without reference to the comprehensive legal survey that was contemplated by the parties to the conveyance, is untenable. The Federal "system is such that a township is surveyed as a unit." Santa Fe Pac. R. Co. v. Lane, 244 U. S. 492, text 495, 37 Sup. Ct. Rep. 714. In State ex rel. Kittel v. Jennings, 47 Fla. 307, 35 South. Rep. 986, the fractional township had been surveyed and the boundaries of fractional section 16 definitely located as school land under the grant of 1845.

When the survey lines of township 53 south, range 40 east, were established by the State, the lines were not changed, but they remained as surveyed and established.

The complainant does not allege that Comfort purchased unsurveyed land in township 53 south, range 40 east with reference to peculiar qualities of particular parts of the land, even if that would affect the rights acquired by the conveyances. Horton's conveyance was executed long after the State survey was made.

Complainant alleges that the lot which he claims contains his ten acres of land, "is wild, unoccupied and unimproved,

and is not in the possession or occupancy of any person or persons."

It is not alleged that the southwest quarter of southwest quarter of southwest quarter of section thirty-five, township fifty-three south, range forty east, as surveyed by the State does not contain ten acres of land, which acreage the complainant is entitled to by virtue of his purchase of land *by that description* from his predecessor in title. Nor is it alleged that the southern boundary of such ten acres is not on the south line of township 53 south, range 40 east, where it should be according to a legal survey as contemplated to be made by the system used by the State and the United States. The contention of complainant is that "Lot 2 between township 53 and 54 south, range 40 east," "as established and designated by the State survey does, in fact, embrace all of the lands hereinafter described as belonging to" complainant, to-wit, does in fact embrace the "southwest ¼ of southwest ¼ of southwest ¼, section 35, township 53 south, range 40 east." In short, the complainant in effect contends that his ten acres were located by a private survey made by using the United States surveyed north line of sections 1 and 2 of township fifty-four south, range forty east, and that the location of the ten acres thus made, is in the space surveyed by the State as Lot 2 between townships fifty-three and fifty-four south, range forty east, because, it is argued, the State survey should have been so made that the south line of township 53 and the north line of township 54 should coincide, even if the acreage content of the sections and townships would be greatly in excess of the requirements of the descriptions used and the acreage stated in the conveyances. This does not give effect to the facts that the map was merely a protraction on paper made "without an actual survey" and that the State sold a stated number of acres, by legal descriptions, of *unsurveyed* lands, included in a vast area of

unsurveyed lands, all of the same general character, when the records affecting the conveyance show the lands were to be subsequently surveyed, and that the described lands aggregating a stated number of acres were to be subsequently identified and definitely and authoritatively located by a legal survey acording to the usual method. The map referred to in the deed shows the townships are to be of uniform normal legal size. The complainant bought his ten acres described as southwest quarter of southwest quarter of southwest quarter, section 35, Township 53 South, Range 40 East, long after that township and section had been surveyed and located by an official survey duly authorized. The unsurveyed lands described and of stated acreage contained in the conveyance to Comfort could not be located within the contemplation of the "official map" until a legal survey of the townships named had been made so as to definitely locate and identify the acreage called for by the deed with reference to sections &c. legally marked on the ground pursuant to a correct legal survey made under the Federal system of surveys.

The errors in the marginal survey lines not being known when the "official maps" were made, approved and adopted and when the conveyance to Comfort was made, the subsequent discovery of such errors while making the survey that was contemplated by the "official map" presented a matter affecting both the grantors and the grantee in the Comfort deed; and as the contemplated survey was to be made in accordance with the United States statutory system of surveying public lands, the rules and practice of such system of surveying should control in making the public survey where errors appear in survey lines and also in disposing of surplus lands or "hiatuses," there being no other controlling law and no contract, express or implied, covering the matter.

Horton has no rights superior to those acquired by Comfort, or to those of his immediate grantor.

The Seminole Fruit and Land Company, the owner of the land, apparently acquiesced in the survey of Section 35, Township 53 South, Range 40 East, from the time it was made in 1912 as shown by the public records and from the time the hiatus lots were formed in February, 1918, till the execution of the conveyance of the ten acres to Horton in July, 1920, during which time the State Trustees conveyed Lot 2 to Edward Wilson. And it does not appear that the Seminole Fruit and Land Company, after acquiescing in the survey, did not make the conveyance to Horton with reference to the State survey, which survey was contemplated by the conveyances to Comfort and to the Seminole Fruit and Land Company.

The private survey made for Horton after the State survey had been made was not authorized by law, it did not purport to survey or to locate the lines or corners of Township 53 South, Range 40 East, and such private survey is insufficient to impeach or impair the official survey of Township 53 South, Range 40 East, made by State authority as was contemplated by the conveyance of the lands.

The appellee contends that when the State Trustees conveyed Section 35, Township 53 South, Range 40 East, to Comfort in 1908, such section "was definitely located in place according to a map adopted as official by said Trustees," and that the official survey of the land changed the location of the section lines. The marking of a numbered section on a map representing several million acres of unsurveyed public land, is not a definite location of the section on the ground, particularly when the map is stated officially to have been made by merely protracting lines on paper, which lines are "as near a location of the sections, townships and ranges" as can be furnished "without an actual

survey of the same.'' The map is a mere paper representation of a vast area of unsurveyed public lands, the lines on the map being intended to show the approximate location of the sections, townships and ranges that are designated by numbers on the map according to the system of government surveys of public lands. An Actual legal survey on the ground was contemplated to be made according to the Federal system and this has been done.

The map cannot have and was not intended to have the effect of a division of the lands or of an actual survey of the lands. In such a case when the contemplated legal survey is made such survey fixes the boundaries of the land described by sections, townships and ranges in the conveyance, and until the lands are surveyed there are no lines to change. In this case no boundary lines have been .changed. They were not ascertained or established until the survey that was contemplated was in fact made by State authority; and there has been no State action interfering with the boundary lines as established.

GIBBS, Circuit Judge, dissenting:

The appellee, the complainant in the lower court and hereafter referred to as the complainant, seeks to quiet his title to a certain portion of Section 35, Township 53 South, Range 40 East, in Dade County, Florida, as against the heirs of one Edward Wilson, and the Trustees of the Internal Improvement Fund of the State of Florida, under whom it is alleged such heirs claim title, are made parties defendant.

There was a demurrer to the bill of complaint which was overruled by the .Chancellor, and this ruling is assigned as error. We find no error in such ruling. Upon the facts alleged, admitted by such demurrer, a court of equity has jurisdiction and the power to award the complainant relief.

The sole question under the record in this case is:

Whether or not the Trustees, after having adopted a map, with the sections, townships, and ranges numbered thereon, and having caused the same to be duly recorded in the county in which the land in controversy is located and according to which such land and other land was sold by them to complainant's predecessor in title, can, by a survey a number of years after the deed evidencing such sale was executed by them, so change the location of the land of the complainant, which, by the description in the deeds to him and to his predecessors in title, was susceptible therefrom of being located by a surveyor, compel the complainant to take not the land described in his deed, and susceptible of location, but other land?

An examination of the record herein shows that the land in controversy is wild, unoccupied and unimproved; that this land with other lands commonly known as the "Everglades" was patented by the United States to the State of Florida, under the provisions of an Act of Congress, approved September 28, 1850, and that such lands at the time of such patent were unsurveyed; that the Trustees of the Internal Improvement Fund of the State of Florida by Act of the Legislature of Florida, 1855, were created and to these Trustees were granted all of said lands and other lands, and said Trustees, as the agents of the State of Florida, were authorized to sell and dispose thereof, for the purpose of carrying out the trusts mentioned in the Acts under which the lands were granted to the State; that the Trustees in furtherance of their trust and to enable them to obtain funds to properly drain the large body of submerged and partially submerged lands, on January 2, 1905, adopted as official a map of the same prepared under the direction of the then Commissioner of Agriculture, one of the Trustees, on which map the lines of the prior exterior surveys of the United States bordering said

lands were prolonged into and upon the lands in question, and further by resolutions upon June 10, and June 14, 1907, amended and confirmed said map as the official map of said lands that by resolution of the Trustees of June 14, 1907, the sections, townships, and ranges upon said map were adopted and ratified, and the said sections were ordered to be numbered similarly and under the same plan and system as sections are numbered under the township, range and section system adopted by the United States, and of the same force and effect; that pursuant to said resolution, the sections were numbered upon the said map and said map was filed for record and recorded in the public records of Dade County, Florida; that a considerable portion of said lands including the land in controversy was sold by the Trustees and conveyed according to said map; that prior to 1905 the east two miles of the northern boundary of Township 54 South, Range 40 East were surveyed and established by the United States; that prior to 1905, Township 53 South, Range 41 East was surveyed by the United States, and the western and northern boundary lines of the township were established; that Township 53 South, Range 40 East has never been surveyed by the United States; that according to the map of the lands adopted in 1905, and amended and confirmed in 1907, it appears that the northern boundary line of Township 54 South, Range 40 East, is the southern boundary line of Township 53 South, Range 40 East, and no strip of land or hiatus appears between Townships 53 and 54 South, Range 40 East; that in December 23, 1912, the Trustees adopted certain amended instructions for surveying the land aforesaid, known as the Everglades, and adopted a map to accompany said amended instructions; that according to such last mentioned map there appears to be a strip of land between the southern boundary of Township 53 South, and the Northern boundary of Township 54

South, Range 40 East; that Section 35 of said Township 53 South, Range 40 East, when located on the ground according to the map of 1912, would not be in the same location as it would be if located according to the official map, by which such land was sold, of 1905-1907; that Section 2, of Township 54, South, Range 40 East, would be in the same location, when located according to the map of 1912, as it would be if located according to the map of 1905-1907; that the deed from the Trustees to Walter R, Comfort, the complainant's predecessor in title, executed October 13, 1908, conveyed with other of said land Section 35, Township 53 South, Range 40 East "according to map as adopted, as official, by Trustees of Internal Improvement Fund of Florida, January 2, 1905, and as amended June 10, 1907, and June 14, 1907" that on May 2, 1919, the Trustees attempted to convey to Edward Wilson, now deceased, the ancestor of the defendants Park L. Wilson, Mary C. Wilson, and Alfred A. Wilson, certain land describing it as Lot 2, between Townships 53 and 54, South, Range 40 East; that upon the official map of 1905-1907 by which said Section 35 was sold to said Comfort by the Trustees no such description appears, and it is only by virtue of the subsequent map of 1912 that the same can be located; that when the land claimed by the complainant is located according to the map of 1905-1907, it constitutes a part of the land described in the deed from the Trustees to Edward Wilson according to the map of 1912; that on June 3, 1909, the said Comfort joined by his wife deeded the land in controversy and other lands which had been deeded to him by the Trustees in 1908 as aforesaid to Seminole Fruit and Land Company, a corporation, and on July 21, 1920, such corporation deeded the land in controversy to complainant all of such deeds referring to the official map of 1905-1907, by which said land was sold and conveyed; and that after obtaining his deed upon lines run in accord-

ance with the description in the deeds under which the complainant deraigned title, the land was duly located in accordance with such description.

The appellant contend that the map of 1905-1907 was made without an actual survey in the field, and was a temporary map subject to change by the Trustees, and further that Comfort took title to the land described in his deed from the Trustees with knowledge of the fact that the Trustees would thereafter survey and locate the same. It is also contended that inasmuch as the complainant purchased the land in controversy subsequent to the passage of Chapter 7892, Laws of Florida, 1919, he had notice of the survey by the State, and was bound thereby.

I have been wholly unable to find any evidence in the deeds between the parties or otherwise of any sufficient foundation for any one of these contentions. The mere fact that the land was sold to Comfort at the rate of Two Dollars per acre, and that the acreage figured on the basis of 640 acres to a Section, substantially makes up the consideration named in the deed is not sufficient to show such intent. There is not a scintilla of oral evidence supporting such a theory, and it is very emphatically contradicted by the resolutions of the Trustees themselves in adopting such map as official, providing for its force and effect, causing its recordation in the County in which such land was located, selling the same by such map, and making the same a part of its deeds and by the long period of time elapsing between the adoption of said map and of the latter map during which the said Comfort sold the land by the same description to another, and still later his grantee sold the land in controversy to the complainant. As to the last contention the complainant is in no manner bound by such Act of the Legislature as his rights are those of his predecessor in title, Comfort and the Seminole Fruit and Land Company.

There are certain principles of law, the application of which to the facts in this case lead inevitably to the conclusion that the decree of the chancellor should be confirmed.

The Board of Trustees of the Internal Improvement Fund is the creation of the State of Florida through its Legislature, and, as agents of the State, these Trustees have no greater power than the State.

A State entering into contracts, either directly or through its duly authorized agent, lays aside its attributes of sovereignty and binds itself substantially as any of its citizens does when he enters into a contract, and, in general, its contracts are interpreted as the contracts of individuals are and controlled by the same laws.   Davis v. Gray, 16 Wallace 203, 232, 21 Law ed. 447, 457.

When a state makes a sale of land, its rights and those of its vendee, when neither restricted nor enlarged by statute, are the same as those of a vendor, or purchaser, both of whom are natural persons.

A valid deed takes effect in praesenti.   Seisin must have a home.

A deed to land, duly executed, describing such land sufficiently to enable a surveyor from such description to locate said land on the ground vests in the grantee the title thereto of the grantor as of the time of the delivery of the deed.

When land is described in a deed according to a plat or map, the plat or map becomes a part of the deed, with the same force as if the land was described by metes and bounds as shown upon the map or plat, 4 R. C. L. 118; 9 Corpus Juris 220; Wells v. Jackson Iron Mfg. Co. 47 N. H. 235, 90 Am. Dec. 575, 588; Craigin v. Powell, 128 U. S. 691, 32 Law Ed. 566; Andreu v. Watkins, 26 Fla. 390, 406-7; 7 So. 876, 880; E. C. Lumber Co. v. Ellis Young

Co., 55 Fla. 256, 263, 45 So. 828; Hailey v. Martin, 38 So. 99.

. Where land has been so sold the grantor thereof has no power thereafter by a change in the method of survey, map, or plan to divest the grantee, or the grantee's successors in title, of the land deeded to him. In Hardin v. Jourdin, 140 U. S. 371, 401, 35 Law Ed. 428, 440, the Court through Mr. Justice Bradley, says, citing Mr. Justice Miller in Moore v. Robbins, 96 U. S. 530, 533, 24 Law Ed. 848, 850:

"'With the title passes all authority for control of the Executive Department over the land and over the title which it has conveyed. It would be as reasonable to hold that any private owner of land who has conveyed it, can, of his own volition, recall, cancel, or annul, the instrument which he has made and delivered. If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy.'" And further: "Again, referring to the power of the Secretary of the Interior after patent, it is said: (534, official text, 850, Law Ed. text) 'He is absolutely without authority. If this were not so, the titles derived from the United States, instead of being the safe and assured evidences of ownership which they are generally supposed to be, would be always subject to the fluctuating and in many cases unreliable action of the Land Office. No man could buy of the grantee with safety, because he could only convey subject to the right of the officers of the government to annul his title.'" And see also Kean v. Calumet Canal and Improvement Co., 190 U. S. 452, 461; 47 Law Ed. 1134, 1137, when Mr. Justice Holmes, speaking for the Court, says: "The resurvey by the United States in 1874 does not affect the Calumet Company's rights. As the United States already had conveyed the lands, it had no jurisdiction to intermeddle with them in the form of a second survey."

The grantee stands in the shoes of his grantor. He is entitled to all the rights of his grantor.

The prohibition of the Constitution of the United States against the passage of laws impairing the obligation of contracts applies to contracts of the State, and those of its agents, as well as to contracts between individuals. Wolff v. New Orleans 103 U. S. 358, 367, 26 Law Ed. 395, 399; Providence Bank v. Billings, 4 Peters 514, 560, 7 Law Ed. 939, 955; New Jersey v. Wilson, 7 Cranch 164, 166; 3 Law Ed. 303; New Orleans Gas Light Co. v. Louisiana L. & H. P. Co., 115 U. S. 650, 663-4, 29 Law Ed. 516, 521.

A grant of land by the State is a contract within the meaning of the constitutional provision against legislation impairing the obligation thereof. Fletcher v. Peck, 6 Cranch 87, 137 *et seq.* 3 Law Ed. 162, 178 *et seq.;* Dartmouth College v. Woodward, 4 Wheaton 518, 4 Law Ed. 629, Davis v. Gray, 16 Wallace 203, 21 Law Ed. 447.

The Legislature has no power to curtail, or impair vested rights. Tison v. Mattair, 8 Fla. 107, 127, City of Orlando v. Giles, 51 Fla. 422, 40 So. 834.

In determining the legality and effect of a statutory regulation, the court should ascertain the legislative intent, and if the ascertained intent will permit, the enactment should be construed and effectuated so as to make it conform to rather than violate applicable provisions and principles of the State and Federal Constitution since it must be assumed that the Legislature intended the enactment to comport with the fundamental law. Davis v. Florida Power Co., 64 Fla. 246, 60 So. 759; Burr v. Florida E. C. Ry. Co., 77 Fla. 259, 81 So. 464, wherein is cited Knights Templar Indem. Co. v. Jarman, 187 U. S. 197, 205, 47 Law Ed. 139, 145; Harriman v. Interstate Commerce Commission, 211 U. S. 407, 422, 53 Law Ed. 253, 264, U. S. v. Delaware and Hudson Co., 213 U. S. 366, 53 Law Ed. 836.

A statute must be so construed, if fairly possible, as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score. U. S. v. Jin Fuey Moy, 241 U. S. 394, 401, 60 Law Ed. 1061, 1064.

The conclusion is natural, and, we have said, inevitable, not only under the fundamental law as set forth in the Constitutions, State and Federal, but also the common law of the land. No matter of expediency, convenience, or possible confusion can authorize the State to cancel or annul its formal deed made without reservations or exceptions to Walter R. Comfort. No question of fraud appears in this record, nor can we see more at the time of conveyance to him than a desire upon the part of the Trustees in good faith to dispose of the land for the purposes of their trust and the willingness of the purchaser to buy such land in its then condition. He paid the consideration therefor and expected to and did receive the title to the land described by the prolongation of the lines of the survey by the United States. The only oral testimony in this case is that of the surveyors, who testified, three for the complainant, and one for the State. The evidence is uncontradicted that the land could be located by the prolongation of the lines of the Government survey. The Trustees being without the means to make a survey on the ground, adopted the method of the prolongation of Government lines, which they had a right to do, and sold thereby. Upon the vesting of the title in him, the power departed from the Trustees to change the location of the land conveyed. The case of Everglades Sugar and Land Co. v. Bryan, 81 Fla. 75, 87 So. 68, is distinguishable from the case at bar. In that case the Court expressly stated that "it does not appear that they (appellants) have been deprived of any land purchased by them," (text official report, 109.) The Act of the Legislature, Chapter 7892, above referred to will not be construed to have been intended to impair vested rights, not to apply to

any land previously granted by the State, through the Trustees, unless consented to by such grantees, where the result of such survey would locate the lands at other and different places than they would be located under the deeds conveying the same.

The vesting of particular lands under grants to railroads and other public and quasi-public corporations in future upon ascertainment by survey of the particular lands intended to be granted is easily distinguishable from a grant *in praesenti* such as is the case at bar.

The contract of the State must be kept inviolate. No instrumentality thereof, whatever be its reasons therefor, should be permitted to impair or change it.

It makes no difference whether the complainant was hurt or not by the change in the location of his land. He was entitled to it where it was located in his deed.

If there was a mutual mistake as to the quantity of the land conveyed possibly there might be a remedy, but this must be judicially ascertained and not otherwise.

The decree of the chancellor should be affirmed.