## SLOAN, etc., et al. v THE TOWN OF DAVIE
### Case No. 86-30339 CJ
Seventeenth Judicial Circuit, Broward County

February 23, 1987

### APPEARANCES OF COUNSEL

**Quentin Long** for South Florida Warehousing.

**Robert J. O'Toole** for plaintiffs.

**Robert W. Crawford** for plaintiffs.

Barry S. Webber for defendant.

H. Collins Forman, Jr., Esquire, Watson & Clark, for intervenor Forman.

## OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

THIS CAUSE came before the Court upon Plaintiffs' Emergency Suit to Enjoin Defendant Town of Davie from Trespassing on Plaintiffs' Property and to Quiet Title to Said Property in Plaintiffs. The original complaint was filed with this Court on November 21, 1986; oral argument and testimony were heard at various times in November and December 1986.

Being fully advised in the premises, the Court herewith renders the following opinion:

## I. INTRODUCTION

The parties hereto, and the manner in which they will be referred to herein, are as follows:

Plaintiffs: Albert H. Sloan and Joan Sloan husband and wife
Sloan Pump Company, a Florida corporation

Defendant: Town of Davie

Intervenors: South Florida Warehousing, II (Intervenor Warehousing)
Hamilton C. Forman and Charles R. Forman (Intervenors Forman)

### A. *HISTORY OF THE CASE*

On November 21, 1986, Plaintiffs filed a complaint seeking a restraining order and quieting of title in reference to certain delineated property. At the time of the institution of suit, Defendant was in the process of installing water and sewer lines through what it perceived to be the public right of way upon Kean Road which is located within its city limits. To the aforesaid construction, Plaintiffs took exception claiming that the alleged road right of way was, in fact, private property owned by Plaintiffs and, therefore, not susceptible to installation of utilities in the absence of appropriate compensation or condemnation.

Acting in the absence of the undersigned judge, and pursuant to

100

direction of the Chief Judge of this Judicial Circuit, Honorable George W. Tedder, Jr. issued an order temporarily restraining Defendant from continuing installation of the utility lines, which construction was then in progress. On November 25, 1986, pursuant to the terms of the restraining order, Plaintiff and Defendant appeared before this Court at which time preliminary arguments of law, as well as some testimony, were presented. Unable to complete the reception of evidence within the limited time then available, the parties agreed to the Court's suggestion that the matter be continued until November 26, 1986.

The Court proceedings of November 26, 1986, included an adjournment to Government Center in Ft. Lauderdale for an examination of the original silks of Newman's Survey (which survey is of singular importance in the instant case). Once again the time then available for the taking of testimony expired without the completion of the assigned task; the date of the continued hearing was announced as December 10, 1986.

Petitions for Intervention filed, simultaneously, in open court by each of the Intervenors identified above were granted, there being no strenuous objection thereto by either Plaintiff or Defendant. Upon the agreement of Plaintiffs, Defendant and both Intervenors, the necessity of additional pleadings by any party was waived, and the Court proceeded to hear the balance of the testimony relevant to the requests for relief contained in both counts of the Complaint.

## II. FINDINGS OF FACT

### A. BACKGROUND

By treaty dated February 22, 1819, ratified February 19, 1821, and proclaimed on February 22, 1821, Spain ceded the territories of East Florida and West Florida to the United States.

By the Act of September 4, 1841, ch. 16 section 8, U.S. Stat. 455, Congress provided a grant of land of 500,000 acres for internal improvement to each new state.

When Florida was admitted to the federal union on March 3, 1845, it became the owner of all the public lands which had been previously part of the Florida Territory, and it received the 500,000 acre grant under the Act of September 4, 1841, for the use and benefit of the people of this state.

By Act of Congress of September 28, 1850, Ch. 84, 9 U.S. Stats. 519, the federal government granted to the state all the then unsold swamp

and overflowed lands[1] not previously granted as part of the Land Grant Act of 1841 or by its creation as a state on March 3, 1845 (5 Stat. 788). Although the aforesaid land had never been surveyed by the United States (primarily because it was all Everglades), the Hon. W. S. Jennings obtained a patent[2] from the United States on April 29, 1903 describing the unsurveyed swamp and overflowed lands by metes and bounds. It is with regard to lands contained within the Jennings patent that the instant case concerns itself.

Congress mandated in the Act of September 28, 1850, that the proceeds from any sales of the lands granted thereunder be used for the purpose of reclaiming them by the use of levees and drains. The title of such lands lay in the state of Florida and its people, but by Chapter 610, Section 253.01 et seq., Acts of 1855, the Legislature transferred title to the remaining lands obtained under the Land Grant of 1841 and the Swamp and Overflowed lands Act of 1850 to five individuals to be known as the Trustees of the Internal Improvement Fund of the State of Florida (hereinafter TIIF).

During the tenures of Governors W. J. Jennings and N. B. Broward, it became the policy of the state of Florida, by vigorously pursuing the mandate of Section 16 of Chapter 610 to drain the swamp and overflowed lands for the purpose of settlement and cultivation, to try to create order out of what was chaos to all but the native Americans living in the Everglades. The TIIF commissioned John W. Newman to survey certain lands in what is now Broward County. The TIIF desired to drain the rich muck lands of the eastern Everglades and to sell the drained land to people possessed of a pioneering spirit who would populate and develop the area and take advantage of its great agricultural potential. Mr. Newman oversaw the digging of the North and South New River Canals by the dredges Everglades and Okeechobee, respectively, while, simultaneously, preparing a map which embraced 22 square miles of land lying in Township 50 South, Range 41 East. The lands lying within Newman's survey are the subject matter of the dispute *sub judice*.

Mr. Newman presented his map to the Hon. W. S. Jennings before he conveyed it to the Trustees. The map reflected the lands to be

---

[1] Swamplands are those which require drainage to dispose of needless water or moisture that they may be made useful for cultivation and/or human habitation. Overflowed lands are those which are periodically covered by non-navigable waters, salt or fresh, which requires dikes or levees to render them useful for cultivation or human habitation.

[2] Everglades patent no. 137, *See Hardee v. Horton*, 90 Fla. 452, 108 So. 189 (1925).

divided into Tiers and Tracts fronting on the North New River Canal and Tracts fronting on the South New River Canal. The Hon. Mr. Jennings described Mr. Newman's map and made certain written recommendations to the TIIF in at their November 21, 1907 meeting. The report of Mr. Jennings was made a part of the TIIF minutes for that day, and the "Map of Drained Land in the Eastern Part of the Everglades in Dade County, Florida" was in part adopted by the TIIF as the "official plat of the lands embraced therein". The remaining part was adopted on September 30, 1908. The area now claimed by Plaintiffs is in the lands platted in the first part of Newman's Survey adopted on November 21, 1907.

As recorded in the public records of Dade County, Newman's Survey subdivides Section 25, Township 50 South Range 41 East, wherein lies the Plaintiffs' lands, into Tracts designated by numbers. On the survey, the specific dimension of each of the identified Tracts is indicated by numbers written inside the Tract boundaries. At regular intervals on Newman's Survey, "spaces" appear between two otherwise contiguous tracts. There is no designation of these "spaces" which run "backward" from the canals on which they front to the rear of the Tiers or Tracts, although each such "space" bears the dimension "30". Each Lot or Tract within the entire 22 square miles of land within the plat of Newman's Survey lies adjacent to at least one such "space".

The Plaintiffs Albert and Joan Sloan took title to Tract 24 of Section 25, Township 50 South, Range 41 East in 1968. The Plaintiff Sloan Pump took title to Tract 23 of Section 25, Township 50 South, Range 41 East in 1983.

One of the "spaces" previously described in this opinion runs between Tracts 23 and 24. The "space" had been improved and graded as a road before either of the Plaintiffs took title to their respective lands. The space bears the name of Kean Road, this appellation apparently given it by, or for, one of the Sloans' predecessors in title.

### III. *ISSUE BEFORE THE COURT*

The Plaintiffs vigorously contend that the "spaces" on the plat of Newman's Survey between contiguous tracts of land, not having been formally dedicated by any language appearing upon the face of the plat as recorded in the public records, belong to the owners of the contiguous tracts. Because Plaintiffs collectively own the portions of Tracts 23 and 24 that abut the disputed land on both sides, they argue that they own that portion of Kean Road that lies within the boundaries of their property.

Defendant and both Intervenors assert, with a vigor equal to that of

Plaintiffs', that the "spaces" between the tracts on the face of Newman's Survey are actually a valid offer to dedicate rights of way for the use and benefit of the public. Since tracts of land were conveyed by instruments that referred to Newman's Survey and because members of the general public, for a period of time long preceding the purchase by Plaintiffs, utilized the spaces at will as roads, ditches, canals, etc., Defendant and Intervenors contend that the offer to dedicate has been accepted and, therefore, the disputed lands belongs to the public.

The issue narrows itself, then, to a determination of what was the intent of the TIIF at the time they adopted Newman's Survey as the official plat of the lands it embraced. Did the TIIF evince sufficient intent to dedicate the "spaces" to the public for its use and convenience, and, if so, has there been acceptance by either an official act or by public user?

## IV. ANALYSIS

### A. THE OFFER

The parties hereto do not dispute the fact that, at the time Newman's Survey was adopted, the population of Broward County, especially in the area now in question, was, to be charitable, sparse. Indeed, everything south of Lake Okeechobee and inland from the East Coast was considered a vast wasteland.

Intervenors Forman were both reared in the area and gave testimony to the Court that was interesting, informative and probative. These lands as recently as 25 years ago were rural in character and utilized mainly for farming. The general public gained access to the subject property and to more remote areas to the west by traveling in a generally east-west direction upon what is now known as Orange Drive. The fact that the roadbed for Orange Drive is consistent with the roadway depicted on Newman's Survey is not without significance to the Court.

Examination of the muniments of title under which Plaintiffs base their claim is most enlightening. In every case the land is described in a manner exactly consistent with Newman's Survey. There is no doubt on the part of the Court that all parties in the chain of Plaintiffs' title relied upon the accuracy of Newman's Survey to insure that they received that quantity of land for which they had paid.

A long time ago in the history of this State, but only a blink of the eye in relation to history itself, the Supreme Court of Florida, quoting with approval from the Oregon case of *Meier v. Portland Cable Ry.*

Co.., 16 Or. 500, 19 P. 610 (1888) in *Porter and the Town of Bartow v. Carpenter*, 38 Fla. 14, 20, 21 So. 788, 790 (1897), said:

[w]hen a person maps off his land into town lots and streets, and offers his lots for sale by reference to a map, there is no mistaking his intention. He designs, if he is honest, that the streets shall belong to the public, and that they will be accepted and used by it as such whenever the public necessity or convenience requires it. He does not, of course, anticipate that the various members of the community will rush forward in hot haste to accept this offer, but that its acceptance will abide the course and events of time.

In *Price v. Stratton*, 45 Fla. 535, 542, 33 So. 644, 646 (1903), the Supreme Court ruled:

Where the owner of a tract of land makes a town plat thereof, laying the same out into blocks . . . and conveys lots with reference to such plat, he thereby evinces an intention to dedicate the streets to public use as such, and his grantees, as against him and those claiming under him, acquire the right to have such streets kept open.

Based on the historical background, it is clear that the TIIF was vested with title to the lands here in question. The Court finds nothing to the contrary in the law books, and assumes the method of dedication to be the same for a public body as for a private individual. Hence, the TIIF could dedicate lands for the use of the public for roads, canals, ditches, parks, etc. because it held title to them.

The Plaintiffs' contention that there exists no sufficient record evidence of an intention, on the part of the TIIF, to dedicate to the public the "spaces" depicted on Newman's Survey is without merit. First, the purpose for which the State of Florida received these lands was to reclaim them by the use of levees and drains, thereby making them habitable and arable. Second, when the TIIF became vested with title to the lands, it was with the explicit directive from the Legislature that it drain the lands for settlement and cultivation. Third, since the lands had never previously been subdivided, John W. Newman, Civil Engineer, was sent to the wilds of the eastern Everglades to drain a portion of these lands and to map them for sale to private individuals. Fourth, when the map was presented to the TIIF, it was accompanied by the written recommendation from the former governor, William S. Jennings (who had procured a patent to the subject lands for the ambitious undertaking of readying these swamp and overflowed lands for cultivation and colonization) that there be reserved rights of way and thoroughfares of sufficient width as might then and in the future be required by the owners and inhabitants of the lands to haul and

transport the products of the area to market.[3] Fifth, the TIIF minutes of November 21, 1907, the date Newman's Survey was adopted, read:

*The following resolution was unanimously adopted:

Resolved by the Trustees of the Internal Improvement Fund of the State of Florida *that a certain plat of lands* in Township 50 South of Range 42 East in Dade County, Florida, *drawn by John W. Newman* under date of November 20th, 1907, and entitled "Map of Drained Land in Eastern part of the Everglades in Dade County" *is hereby adopted as the official plat of the lands embraced therein.* (emphasis added)

---

[3] The following excerpt is taken from the minutes of the TIIF Florida State Archives: Series 194-B, Vol. 6:

. . .

That the canals are a success, and are reclaiming the land as the dredges progress, is thoroughly established. The canals reduce the water level from the surface to a point six feet below the surface of the ground, as shown by the level of the water in the canal, and the land for a mile on either side of the canal is entirely reclaimed, and is practically ready for preparation for cultivation, and the general influence of the drainage reaches a much greater distance than one mile. While on the Dredge Everglades, Captain John Newman the Engineer exhibited to us his survey plan of the reclaimed lands that you are contemplating placing on the market in a short time. I observed from his plat that he has divided the reclaimed land owned by the Trustees on either side of the canals, square with the canals; I mean without regard to the customary directions, or the usual lands lines of the subdivisions of the United States plan of survey, in order that the frontage on the canal will be all of uniform width making tracts or lots of 600 feet front, and sufficient depth to make ten acres in square form as nearly as practicable, requiring the lots to extend back 720 feet to include ten acres in a tract. That immediately back of each lot is another of the same width and size etc. His plat contemplates a description and deed to each purchaser from the center of the canal, and he has not provided any cross roadways or spaces for highways across the canals or ditches. This to my mind should be changed, and a canal right of way 300 ft. in width reserved for the Trustees and certainly not less than 100 feet on either side of the outer banks of the canal with roadways likewise reserved at a distance not greater than 1,200 feet fronting on the canal, running back on land lines as established to other natural outlets, giving to each lot or tract of land so surveyed an outlet on a public thoroughfare of sufficient width for both the canal and the roadway or ditch, as circumstances now and in the future may require.

The need for these rights of way and thoroughfares I submit is apparent. It will require approximately 100 feet on either side of the canal to take care of the overburden and the cleaning out and care of the canal, which should never be hampered by any question of ownership and right of way or control over the canal and its banks at any and all times by the Trustees. It is also essential that the owners of the land should have some public thoroughfare along the canal for the hauling and transportation of the products of the territory in question, there being no other roads or outlets. That the land is very rich there is no doubt. That it is going to be valuable from a productive standpoint, no one seems to question.

. . .

106

Resolved further, that the Secretary of the Trustees be and is hereby instructed to have said plat recorded in the Office of the Clerk of the Circuit Court of Dade County, Florida.

Resolved further, that the lots of lands described in the foregoing plat or map be sold as follows:

Lots touching the canal right of way at twenty dollars per acre.

Lots not touching the canal right of way at fifteen dollars per acre.

It was also resolved that the Secretary give public notice through the columns of three newspapers published in this state that the Trustees are offering said lands described in said map of John W. Newman for sale, at prices above mentioned.

The Trustees then adjourned.

Attest:

W. M. McIntosh, Jr

Secretary                                                          N. B. Broward
                                                                      Governor

*For reports of Gov. Broward and Hon. W. S. Jennings, Gen. Counsel, and map adopted on this date see page 381 et seq.

Sixth, the face of the plat itself reads:

I, J. C. Luning, Secretary to the Trustees of the Internal Improvement Fund of the State of Florida: Hereby Certify that the attached plat is a true and correct copy of the originals of the Surveys numbered One and Tw made by John W. Newman of Land lying in Township 50 South, Range 41 East in the Everglades of Florida.

I further certify that Sub-division numbered One, was adopted by said Trustees November 21, A.D. 1907 and that Sub-division numbered Two was adopted by said Trustees September 30, A.D., 1908.

J. C. Luning
Secretary, Trustees Internal
Improvement Fund of Florida

Seventh, Newman's Survey was recorded in the Plat Books of Dade County, Florida. Eighth, in deeds from the TIIF, Newman's Survey is referred to as a plat.

To this Court, the abundance of evidence clearly establishes, by the greater weight thereof, that the TIIF, when it adopted Newman's Survey, intended to declare to the public at large that the land was for sale with the "spaces" thereon to be rights of way and thoroughfares

**107**

for the use of the general public. Following, then, the rationale of *Price, supra,* the intent to dedicate the spaces for roadways, ditches, canals, etc. is equally clear. This Court finds that platting the lands within Newman's Survey and laying out spaces between the lots and blocks on its face constituted a valid offer to dedicate the spaces to the public, acceptance of which would constitute a completed, binding decision. The Court notes that without such rights-of-way, landowners not directly abutting on either the North or South New River Canals would not have access to their properties except across the lands of another.

The conclusion here reached is especially warranted in light of the language of the Florida Supreme Court in *Palmetto v. Katsch,* 86 Fla. 506, 509, 89 So. 352, 353 (1923), to wit:

> a common law dedication is the setting apart of land for public use, and to constitute it there must be an intention by the owner clearly indicated by his words or acts to dedicate the land to the public use, and an acceptance by the public of the dedication. This seems to be the general rule, and whether an express or an implied dedication is relied on, the intention of the owner to set apart the lands for the use of the public is the foundation and essence of every dedication. (citations omitted).

> The act of dedication, is affirmative, in character, need not be by formal act or dedication, may be by parole, [sic] may result from the conduct of the owner of the lands dedicated, and may be manifested by a written grant, affirmative acts or permissive conduct of the dedicator. In fact, *any manner in which the owner sees fit to indicate a present intention to appropriate his lands to public use meets the requirement of the law.*

> The means generally exercised to express one's purpose or intention to dedicate his lands to the public use are by a (1) written instrument executed for that purpose; (2) *filing a plat or map of one's property designating thereon streets, alleys, parks, etc.;* (3) *platting one's lands and selling lots and blocks pursuant to said plat indicating thereon places for parks, streets, public grounds,* etc.; (4) recitals in a deed by which the right of the public are recognized; (5) oral declarations followed by acts consistent therewith; (6) affirmative acts of the owner with reference to his property such as throwing it open in a town, fencing and designating streets thereon; (7) acquiescence of the owner in the use of his property by the public for public purposes. (emphasis supplied).

> (emphasis supplied through quote).

108

## B. *THE ACCEPTANCE*

Having concluded that there was an intent to dedicate and a valid offer made on the part of the landowner, the only other question remaining to be resolved by this Court is whether that dedication has been accepted.[4] The acceptance of such an offer may be by public user or by formal resolution of the proper authorities. *See Robinson v. Town of Riviera*, 157 Fla. 194, 197, 25 So. 2d 277, 278 (1946).

As stated earlier in these findings, Orange Drive, a public road, follows the course of one of the spaces shown on the plat of Newman's Survey. State Road 84, Oakes Road and other roads, ditches, canals, etc. lie within the "spaces" shown on the plat of Newman's Survey, and all are utilized freely by the public.

When faced with the issue of whether there had been an acceptance of all of the dedications on the face of a properly recorded plat, although for many years after its recordation some of the dedications were not used by the public, the Florida Supreme Court held that—even though only the main thoroughfare had been paved—the public authority was presumed to have accepted the offer of dedication of *all* the streets shown on the recorded plat. *See Indian Rocks Beach South Shore v. Ewell*, 59 So. 2d 647, 655 (Fla. 1952).

Citing *Indian Rocks*, the Third District Court of Appeal stated "[t]he acceptance of some of the streets or roads in a platted subdivision is said to constitute an acceptance of the offer to dedicate all of the roads in the subdivision, absent proof of an intention to limit the acceptance". *Hughes v. Town of Mexico Beach*, 455 So.2d 566, at 567 (Fla. 1st D.C.A., 1984); *See also Town of Palm Beach v. Palm Beach County*, 313 So.2d 770 (Fla. 4th D.C.A., 1975) and *Porter, supra*.

The above described principle is logical and reasonable. When a plat is recorded, and property is brought and sold with reliance upon, and with reference to, such plat, the general public, as well as remote purchasers (even in undeveloped areas), should not be penalized just because the governmental authority with jurisdiction to do so does not speedily pave or improve all dedicated areas. It is more reflective of governmental practice that improvements are made as the need arises.

In the instant case, there is no evidence of a need for Defendant to install water or sewer lines prior to the present time. With the recent incorporation of the Plaintiffs' land into the Town of Davie, and with the development of the lands in Tract 10 of Section 25 immediately to

---

[4] Plaintiffs herein do not concede any proper intention to dedicate, therefore they do not contend that any such offer has been revoked before acceptance.

the north of the Plaintiffs, by Intervenor Warehousing, the public convenience and necessity now require the laying of the described utility lines.

Until 1966, Intervenors Forman owned Tracts 7, 8, 9 and portions of Tract 6 in Section 25 immediately to the north of the Plaintiffs' land. The evidence is clear that Intervenors Forman, as well as the general public, used the "space" between Tracts 23 and 24 to gain access to Orange Drive located to the south of Plaintiffs' property. Aerial photographs taken over a period of years, were received into evidence; they show a dirt road, in various states of completion, which ran from the north line of Section 25, at Oakes Road, south between Tracts 7 and 8, 9 and 10 and 23 and 24 to Orange Drive. The testimony of Intervenors Forman establishes that persons not owning property within Section 25 used Kean Road to travel to lands within Section 25[5] to buy produce of farms, materials mined there and to hunt; such use is the very use of the "spaces" that the Hon. W. S. Jennings and the TIIF contemplated in their meeting when the plat of Subdivision One (wherein Plaintiffs' land is located) was adopted.[6]

Intervenors Forman also testified that Broward County built and maintained Kean road. Plaintiffs admitted that Broward County had attempted to maintain Kean road at least once since they took title to Tract 24 in 1968, but that they (Plaintiffs) had prevented the maintenance crew from doing so and told the workers not to return.

Plaintiffs admitted never having *ad valorem* taxes levied against the space between Tracts 23 and 24 and not ever having paid any *ad valorem* taxes on Kean Road to Broward County, to the City of Hacienda Village or to the Defendant.

Defendant produced a copy of an ordinance[7] which annexed the Plaintiffs' property into the City of Hacienda Village, Defendant's predecessor. The legal description contained in the annexation ordinance omits Kean Road. There was no evidence adduced before this Court showing an abandonment of Kean Road by resolution, ordinance, act or deed of any governmental entity.

Intervenors Forman produced two quit claim deeds from the TIIF to

---

[5] Intervenors Forman testified that they kept a gate across the road where it crosses from Tracts 9 and 10 to Tracts 23 and 24, but that the gate was left unlocked as its purpose was to keep cattle in, not to keep people out. The Formans permitted hunting on their lands by members of the general public until several of their cows were shot by irresponsible hunters.

[6] *See* note 3, *supra*.

[7] Defendant's Exhibit 4.

110

themselves as Trustees, the first such deed[8] showing a general release of the TIIF's interest in Tracts 7, 8 and 9 of Section 25 which it had kept by reservation in the original deeds out from them,[9] such deed retaining an interest in the 33 foot right-of-way lying between Tracts 7 and 8; the second quit-claim deed[10] shows a release of all the TIIF's interest in the 30 foot, more or less, easement between Tracts 7 and 8.

Defendant produced a copy of Broward County Ordinance number 67-105511,[11] adopted in October of 1967, showing the County's acceptance of "all offers to dedicate any lands to public use in Broward County contained on plats of land [t]heretofore recorded in the public records of [Broward] County. . . ."

In the mind of this Court, there is no doubt that the offer of the TIIF of the non-specified purpose spaces contained on the plat of Newman's Survey has been accepted by the members of the general public and by Broward County. Although all of the dedications were not improved at once, the offer of all the rights of way was accepted by the improvement of some of them. The use by the public of Kean Road, while sparse or intermittent owing to the rural character of the area, was use enough. The acceptance ordinance of Broward County,[12] validly passed, acted to cure any defect that might have rendered a prior acceptance infirm (a conclusion stated without any suggestion that any such evidence of infirmity was presented to the Court).

Any one of the aforementioned three modes of acceptance would have been sufficient, in and of itself, to establish acceptance. Taken together, and viewed through the law of *Porter, Robinson* and *Indian Rocks, supra,* there is more than ample evidence of acceptance of the non-specified purpose rights of way which are reflected within the four corners of the plat of Newman's Survey. It is the conclusion of the Court that the offer to dedicate all of the non-specified purpose rights of way contained in the plat of Newman's Survey has been accepted. For the Court to rule any other way would be to destroy the order so painstakingly created by our visionary forbears and to return chaos to

---

[8] Intervenors Formans' Exhibit 8.

[9] This deed shows the TIIF's incorporation of former Governor Jennings' recommendations to keep an area on either side of its canals to "take care of the over burden and the clearing out of the canal", found in the trustees minutes of their November 21, 1907 meeting. Note 3, *supra.*

[10] Intervenors Formans' Exhibit 9.

[11] Defendant's Exhibit 1.

[12] *See* note 11, *supra.*

22 square miles of land occupied and inhabited by thousands of unsuspecting folk.

## C. *OWNERSHIP*

When Plaintiffs first came before the Court, they quoted *Travis Company v. City of Coral Gables*, 153 So.2d 750 (Fla. 3rd D.C.A. 1963). *Travis* holds that, "a conveyance of a parcel of land according to a plat, which parcel is bound by a street, private road or other private way, carries with it title to the center of such street, road or way, unless the deed evidences a contrary intention." 153 So.2d at 751. The above quoted language is correct as far as it goes, but the cases upon which *Travis* is founded make it clear that such ownership of the underlying fee in the road, street or way is *subject to the public easement. See Smith v. Horn*, 70 Fla. 484, 70 So. 435 (1915); *Servando Building Company v. Zimmerman*, 91 So. 2d 289 (Fla. 1956) and *Florida State Turnpike Authority v. Anhoco Corp.*, 107 So. 2d 51 (Fla. 3d D.C.A. 1958).

Plaintiffs are correct that they own Kean Road between and among themselves; their interest, however, is subject to the right of the public to use Kean Road. "Public use" includes the Defendant's right to pave it, widen it, and to lay water and sewer pipes or other utilities within its boundaries. Plaintiffs may acquire the right to exclusive possession of Kean Road only if the Defendant properly abandons it. It is well settled that Plaintiffs could not have acquired an interest as against the public by prescription or by adverse possession. *See Lovey v. Escambia County*, 141 So. 2d 762 (Fla. 1st D.C.A. 1962); Annot. 55 ALR 2d 554.

## V. *CONCLUSION*

ORDERED AND ADJUDGED that:

(1) Newman's Survey is a valid and existing plat of the lands contained therein;

(2) the recordation of the plat by the TIIF constituted a valid offer to dedicate the non-specified purpose rights of way contained on its face to the public;

(3) the acceptance of the offer to dedicate all of the non-specified purpose rights of way occurred with the first improvement done by the proper authority of any of the non-specified rights-of-way;

(4) in particular, the non-specified purpose right of way between Tracts 23 and 24 of Section 25, Township 50 South, Range 41 East, was accepted by public user at least ten years before any of the Plaintiffs took title to Tract 24 in 1968;

112

(5) the injunction against the Defendant is hereby dissolved;

(6) Plaintiffs shall do nothing henceforth to interfere with the public's use of Kean Road, including, but not limited to, Defendant's laying of water and sewer lines within the boundaries thereof, or the maintenance or improvements of Kean Road;

(7) the injunction bond previously posted by Plaintiffs is not discharged and shall abide further order of this Court upon proper motion and notice.

DONE AND ORDERED, in Chambers, at Fort Lauderdale, Broward County, Florida, this 23rd day of February, 1987.